UNITED STATES of America

v.

Edwin EDWARDS, et al.

No. CR. 98–165–B–M2.

United States District Court,
M.D. Louisiana.

Aug. 22, 2000.

James B. Letten, Peter G. Strasser, Department of Justice, U.S. Attorney's Office, New Orleans, Michael William Magner, U.S. Attorney's Office, Thomas L. Watson, Department of Justice, U.S. Attorney's Office, Eddie J. Jordan, Jr., U.S. Attorney's Office, Stephen A. Higginson, U.S. Attorney's Office, New Orleans, for Plaintiff.

Rebecca L. Hudsmith, Federal Public Defenders Office, Lafayette, LA, William H. Jeffers, Jr., James R. Heavner, Jr., Miller, Cassidy, Larroca & Lewin, LLP, Washington, DC, James Michael Small, Law Offices of J. Michael Small, Alexandria, LA, Patrick Fanning, New Orleans, LA, Mary Olive Pierson, Cooper & Pierson, Baton Rouge, LA, Camille F. Gravel, JR., Alexandria, LA, Hillar C. Moore, III, Baton Rouge, LA, Kenneth Craig Smith, Jr., Smith & John, Shreveport, LA, Richard G. Crane, Nashville, TN, Michael S. Fawer, Covington, LA, Daniel I. Small, Butters, Brazilian & Small, LLP, Lewis O. Unglesby, Lewis O. Unglesby, Baton Rouge, LA, James M. Cole, Bryan M. Cole, Bryan Cave LLP, Washington, DC, Karl J. Koch, McGlynn, Glisson & Koch, Baton Rouge, LA, for Defendants.

Edwin Edwards, Baton, Rouge, LA, Pro se.

Stephen Edwards, Baton, Rouge, LA, Pro se.

## RULING ON MOTIONS TO SUPPRESS

POLOZOLA, Chief Judge.

This matter is before the Court on various pre-trial, trial and post trial motions filed by the defendants which seek to suppress the results of wire, oral, video and electronic surveillance. Edwin Edwards, Stephen Edwards and Cecil Brown also have filed motions to suppress evidence obtained as a result of searches conducted pursuant to a search of their homes, offices and/or safe deposit boxes. The defendants also sought in pre-trial motions an evidentiary hearing under *Franks v. Delaware.*[1] The defendants renewed their *Franks* motion and motions to suppress in motions filed during the course of the trial.[2] For reasons which follow, these motions are denied.

---

1. 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

2. The defendants renewed their *Franks* motion and motion to suppress in their motion for a new trial. A separate ruling will be made on the defendants' motion for a new trial at a later date.

## Introduction

Prior to the trial, the defendants filed the following motions to suppress: (1) motion of all defendants to suppress the fruits of wire, oral and electronic surveillance;[3] (2) Stephen Edwards' motion to suppress evidence derived from a tape recorded conversation between Richard Shetler and Stephen Edwards;[4] (3) Cecil Brown's motion to suppress fruits of search warrants relative to Brown's office and residence;[5] (4) Stephen Edwards' motion to suppress fruits of search warrants relative to his office, residence, and safe deposit box number 5069;[6] and (5) Edwin Edwards' motion to suppress fruits of search warrants relative to his office, residence, and safe deposit box number 2378.[7] On November 17, 1999, the Court held oral argument on these motions. Thereafter, the Court denied each of the pre-trial suppression motions. The Court also denied defendants' request for a *Franks* hearing. During the course of the trial, the defendants filed a renewed motion for a *Franks* hearing and to suppress evidence. The Court denied each of these motions and now assigns reasons in support of its decisions.

All defendants seek to suppress all evidence obtained as a result of wire, oral, video and electronic surveillance. The defendants seek relief under Title III, 18 U.S.C. §§ 2510–2522 and the Fourth Amendment. Defendants contend:

(1) The wire surveillance of Cecil Brown is based on the uncorroborated story of Pat Graham;

(2) The FBI agents did not inform Judge Donald E. Walter of Pat Graham's dishonesty;

(3) The June 26, 1996 affidavit of Agent Freddie Cleveland lacked probable cause;

(4) Agent Cleveland's affidavit failed to demonstrate necessity as required by Title III;

(5) Since there was improper surveillance of Cecil Brown's telephone, all evidence obtained during the entire course of surveillance must be suppressed;

(6) The surveillance of Edwin Edwards' home was improper because there was no basis to conclude that a wiretap at Edwin Edwards' home would produce evidence of crimes;

(7) There was no probable cause for repeated extensions of the wiretap order at Edwin Edwards' home;

(8) There was no probable cause to believe that Edwin Edwards' law office had or would be used to commit the crimes alleged;

(9) The affidavit of Agent Geoffrey Santini failed to establish probable cause to conduct surveillance of Edwin Edwards' law office;

(10) The surveillance of Stephen Edwards' office was conducted without court authorization;

(11) There was no probable cause to believe that the law office of Stephen Edwards had been or would be used to commit the crimes alleged.

In response to these motions, the government contends that each of the surveillance orders issued by Judges Donald E. Walter and John V. Parker were based on probable cause. The government further contends the surveillance orders were properly issued pursuant to Title III, 18 U.S.C. §§ 2510–2522 and there were no violations of the Fourth Amendment. Finally, the government contends the FBI agents did not intentionally or recklessly mislead or present false information or

---

**3.** Rec. Doc. No. 440.

**4.** Rec. Doc. No. 445.

**5.** Rec. Doc. No. 450.

**6.** Rec. Doc. No. 447.

**7.** Rec. Doc. No. 469, replacing Rec. Doc. No. 452.

omit material information to the federal judges who issued the Title III orders.

The defendants Edwin Edwards, Stephen Edwards and Cecil Brown have also filed motions to suppress evidence obtained as a result of search warrants. Edwin Edwards seeks to suppress evidence taken from his home, located at 19228 Troon Court, safe deposit box number 2378 at City National Bank and his law office.

Stephen Edwards seeks to suppress a tape recorded conversation between Richard Shetler and Stephen Edwards,[8] and any evidence obtained from a search of his residence, safe deposit box number 5069 located at Regions Bank, and the office located at 4621 Jamestown Avenue.

Cecil Brown has also filed a motion to suppress evidence obtained from the search of his residence, Route Box 62, Eunice, Louisiana; Cecil Brown's Building, Brown's Auction Company, Louisiana Consultants, Inc., 1211 East Laurel Street, Eunice, Louisiana; and Kenneth Pitre's law office, 100 Vivian Street, Eunice, Louisiana.

In response to the defendants' motions to suppress the evidence obtained pursuant to these search warrants, the government contends the warrants were based on probable cause and each search was valid and constitutional.

Thus, the Court must determine whether the Title III authorizations issued by Judges Walter and Parker were valid. The Court must also determine the validity of the search warrants issued in this case.

After hearing the arguments and evidence presented in connection with the pre-trial motions to suppress, the Court denied each of the motions. The Court also found that the defendants were not entitled to an evidentiary hearing under *Franks*.

During the trial, the defendants filed another request for a *Franks* hearing and renewed their motion to suppress. The Court again finds that there was and is no need for a *Franks* hearing. The Court also finds defendants' renewed motion to suppress is without merit and should be denied.

The Court will discuss each of the motions and the various contentions of the parties. Each of the parties' contentions was considered by the Court in deciding the motions whether or not specifically discussed herein.

**Probable Cause Standard**

In *Illinois v. Gates*,[9] the Supreme Court adopted a "totality of the circumstances" analysis for determining whether probable cause exists for the issuance of a search warrant. The Court noted that the probable cause standard is a "practical, nontechnical conception."[10] Indeed, the *Gates* Court stated:

"In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."

\*     \*     \*     \*     \*     \*

As these comments illustrate, probable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts-not readily, or even usefully, reduced to a neat set of legal rules.

\*     \*     \*     \*     \*     \*

As early as *Locke v. United States*, 11 U.S. 339, 7 Cranch, 339, 348, 3 L.Ed. 364 (1813), Chief Justice Marshall observed, in a closely related context: "[T]he term

---

8. The Court has already issued a separate written opinion on this issue. *See* Rec. Doc. Nos. 770 and 771.

9. 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

10. *Id.* at 233, 103 S.Ct. at 2330 (quoting *Brinegar v. United States*, 338 U.S. 160, 173, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949)).

'probable cause,' according to its usual acceptation, means less than evidence which would justify condemnation.... It imports a seizure made under circumstances which warrant suspicion." ... Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision.[11]

The standard under which a court is to review a magistrate judge's or district judge's initial determination of probable cause was set forth in *Gates* as follows:

Similarly, we have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's "determination of probable cause should be paid great deference by reviewing courts." "A grudging or negative attitude by reviewing courts toward warrants[ ]" is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; "courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner." [12]

Although *Illinois v. Gates* involved the adequacy of a search warrant, the same "totality of the circumstances" test has been applied to determine whether probable cause existed for the authorization of an order permitting the interception of telephone calls and other conversations pursuant to 18 U.S.C. § 2518(3).[13] An application for a court-authorized wiretap "must demonstrate probable cause to believe that the target has committed, is committing, or will commit a crime, as well as 'probable cause for belief that particular communications concerning that offense will be obtained through such interception.' " [14] Probable cause is evaluated utilizing a totality of the circumstances test.[15]

In *United States v. Gonzales*,[16] the Fifth Circuit explained the meaning of probable cause in the context of a wiretap as follows:

An order authorizing a wiretap, like an ordinary search warrant, must be supported by a finding of probable cause. If the judge uses common sense and bases [a] finding on the entire picture presented [ ], our review is limited. "When this is done [the] determination is conclusive in the absence of arbitrariness." The task of the issuing judge is to make a common sense decision whether the affidavit shows a fair probability that evidence will be obtained, according to all the circumstances, including the veracity and basis of knowledge of anyone supplying hearsay information.[17]

In other words, "[p]robable cause is to be gleaned from a 'common sense reading of the entire affidavit' ...." [18]

---

11.  *Gates,* 462 U.S. at 231, 232, 235, 103 S.Ct. at 2328, 2329, 2330 (internal citations omitted).

12.  *Id.* at 236, 103 S.Ct. at 2331 (internal citations omitted).

13.  *United States v. Bankston,* 182 F.3d 296, 306 (5th Cir.1999), *cert. granted in part by Cleveland v. U.S.,* 529 U.S. 1017, 120 S.Ct. 1416, 146 L.Ed.2d 309 (Mar. 20, 2000) (No. 99–804) (citing *United States v. Dickey,* 102 F.3d 157, 162 (5th Cir.1996)). *See also United States v. Cherry,* 50 F.3d 338, 341 (5th Cir.1995); *Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527.

14.  *Bankston,* 182 F.3d at 305–306 (citing 18 U.S.C. § 2518(3)(a)-(b)).

15.  *Bankston,* 182 F.3d at 306 (citing *Dickey,* 102 F.3d at 162).

16.  866 F.2d 781 (5th Cir.1989), *cert. denied,* 490 U.S. 1093, 109 S.Ct. 2438, 104 L.Ed.2d 994 (1989).

17.  *Id.* at 786 (quoting *United States v. Weinrich,* 586 F.2d 481, 487 (5th Cir.1978), *cert. denied,* 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed.2d 243 (1979), *and cert. denied,* 441 U.S. 927, 99 S.Ct. 2041, 60 L.Ed.2d 402 (1979)).

18.  *United States v. Hyde,* 574 F.2d 856, 863 (5th Cir.1978) (quoting *Spinelli v. United States,* 393 U.S. 410, 415, 89 S.Ct. 584, 588, 21 L.Ed.2d 637 (1969)).

A careful review of the affidavits submitted to Judges Walter and Parker to obtain orders authorizing the use of oral, video and electronic surveillance reveals that they were supported by probable cause. The search warrants issued by these judges for the searches of homes, offices and/or safe deposit boxes of the various defendants were also supported by probable cause. These conclusions will be discussed in more detail later in this opinion.

The Court now turns to a discussion of whether the Court should have granted the defendants a *Franks* hearing.

## The Standard for a *Franks* Hearing

The defendants' motion to suppress challenges the truthfulness of the affidavits submitted by the government to support its request for a surveillance order. The defendants contend the affidavits contained intentional and/or reckless false statements or material omissions. The Court believes an analysis of the standards set forth by the Supreme Court in *Franks* and jurisprudence from the Fifth Circuit and other circuits on this issue is essential to properly decide this issue.

In *United States v. Bankston,* the Fifth Circuit succinctly summarized the standards the defendants must meet to obtain a *Franks* hearing as follows:

> In *Franks v. Delaware,* the Supreme Court held that a defendant is entitled to an evidentiary hearing to contest the validity of a search warrant if he makes a substantial preliminary showing that (1) allegations in a supporting affidavit were a deliberate falsehood or made with a reckless disregard for the truth and (2) the remaining portion of the affidavit is not sufficient to support a finding of probable cause. We have explained that "even if the defendant makes a showing of deliberate falsity or

reckless disregard for the truth by law enforcement officers, he is not entitled to a hearing if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause." [19]

In *United States v. Cleveland,*[20] Judge Sarah Vance set forth a more detailed discussion and analysis of the *Franks* standards and the jurisprudence which has ensued following the *Franks* decision. The Court adopts the following from Judge Vance's very thorough opinion: [21]

> In *Franks,* the Supreme Court determined that criminal defendants have a limited right, under the Fourth and Fourteenth Amendments, to challenge the truthfulness of factual statements made in an affidavit supporting a search warrant, subsequent to the *ex parte* issuance of the warrant. *Franks,* 438 U.S. at 155–56, 98 S.Ct. at 2676. *Franks'* rule is of "limited scope, both in regard to when exclusion of the seized evidence is mandated, and when a hearing on allegations of misstatements must be accorded." *Id.* at 167, 98 S.Ct. at 2682.
>
> Under *Franks,* "[t]here is … a presumption of validity with respect to the affidavit supporting the search warrant." *Id.* at 171, 98 S.Ct. at 2684. In order to receive an evidentiary hearing on suppression, a defendant attacking the validity of an affidavit supporting a search warrant must make a "substantial preliminary showing" that: (1) the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement in the warrant affidavit and (2) the remaining portion of the affidavit is insufficient to support a find-

**19.** 182 F.3d 296, 305 (5th Cir.1999) (quoting *United States v. Privette,* 947 F.2d 1259, 1261 (5th Cir.1991)) (internal citation omitted).

**20.** 964 F.Supp. 1073 (E.D.La.1997).

**21.** The Fifth Circuit affirmed Judge Vance's opinion. *See United States v. Bankston,* 182 F.3d 296 (5th Cir.1999), *cert. granted in part by Cleveland v. United States,* 529 U.S. 1017, 120 S.Ct. 1416, 146 L.Ed.2d 309 (2000).

ing of probable cause. *Id.* at 171, 98 S.Ct. at 2684; *see also, United States v. Dickey,* 102 F.3d 157, 161–62 (5th Cir. 1996). The Court spelled out in some detail what it meant by a "substantial preliminary showing:"

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.

*Id.* at 171–72, 98 S.Ct. at 2684.

The "substantial preliminary showing" requirement is not lightly met. *See United States v. Hiveley,* 61 F.3d 1358, 1360 (8th Cir.1995); *United States v. Tibolt,* 72 F.3d 965, 973 (1st Cir.1995), *cert. denied,* 518 U.S. 1020, 116 S.Ct. 2554, 135 L.Ed.2d 1073 (1996); *United States v. Wajda,* 810 F.2d 754, 758 (8th Cir.1987), *cert. denied,* 481 U.S. 1040, 107 S.Ct. 1981, 95 L.Ed.2d 821 (1987). Furthermore, even if the defendant makes the requisite substantial preliminary showing for an evidentiary hearing,

suppression is still not mandated unless the defendant establishes at the hearing, by a preponderance of evidence, that the misstatements in question were made intentionally or with reckless disregard for the truth and that, with the false statement omitted, probable cause was lacking. *Franks,* 438 U.S. at 156, 98 S.Ct. at 2676.

The *Franks* holding has been extended to cover alleged omissions in a supporting affidavit, as well as false statements. *See United States v. Tomblin,* 46 F.3d 1369, 1377 (5th Cir.1995); *United States v. Atkin,* 107 F.3d 1213, 1216–17 (6th Cir.1997); *United States v. Hunter,* 86 F.3d 679, 682 (7th Cir.1996), *cert. denied,* 519 U.S. 985, 117 S.Ct. 443, 136 L.Ed.2d 339 (1996); *Hiveley,* 61 F.3d at 1360; *United States v. Collins,* 61 F.3d 1379, 1384 (9th Cir.1995), *cert. denied,* 516 U.S. 1000, 116 S.Ct. 543, 133 L.Ed.2d 446 (1995); *United States v. Paradis,* 802 F.2d 553, 558 (1st Cir. 1986). Courts have noted, however, that while omissions are not exempt from inquiry under *Franks,* affidavits containing omissions of potentially exculpatory information are less likely to present a question of impermissible official conduct than those that affirmatively include false information. *Atkin,* 107 F.3d at 1216–17; *United States v. Martin,* 920 F.2d 393, 398 (6th Cir.1990); *United States v. Colkley,* 899 F.2d 297, 301 (4th Cir.1990). In cases involving omissions, to trigger an evidentiary hearing, a defendant must make a substantial preliminary showing that: 1) the omission was made intentionally and/or with reckless disregard for the omission's tendency to mislead and 2) if the omitted material had been included in the supporting affidavit, there would not have been probable cause. *See, e.g., Atkin,* 107 F.3d at 1217 ("If the defendant does succeed in making a preliminary showing that the government affiant engaged in 'deliberate falsehood' or 'reckless disregard for the truth' in omitting information from the affidavit, the court must consider the

affidavit, including the omitted portions, and determine whether probable cause still exists."); *see also, Tomblin,* 46 F.3d at 1377; *Hiveley,* 61 F.3d at 1360; *Collins,* 61 F.3d at 1384; *Paradis,* 802 F.2d at 558.

The Fifth Circuit has acknowledged that "it will often be difficult for an accused to prove that an omission was made intentionally or with reckless disregard rather than negligently unless he has somehow gained independent evidence that the affiant had acted from bad motive or recklessly in conducting his investigation and making the affidavit." *United States v. Martin,* 615 F.2d 318, 329 (5th Cir.1980). For this reason, the Fifth Circuit has recognized that "when the facts omitted from the affidavit are *clearly critical* to a finding of probable cause the fact of recklessness may be inferred from proof of the omission itself." *Id.* (emphasis added). *See also, United States v. Cronan,* 937 F.2d 163, 165 (5th Cir.1991); *Hale v. Fish,* 899 F.2d 390, 400 (5th Cir.1990) (same); *United States v. Namer,* 680 F.2d 1088, 1094 (5th Cir.1982), *cert. denied,* 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988). Thus, under Fifth Circuit law, if the materiality of the omission is great enough, recklessness can be inferred. In such cases, the analytical concepts of materiality and recklessness are "bound together," collapsing the dual inquiry of *Franks* into both "intentionality" and "materiality" into a single inquiry into materiality. *Namer,* 680 F.2d at 1094. But see, *Colkley,* 899 F.2d at 301 (rejecting Fifth Circuit position that bad motive under *Franks* can be inferred from fact of omission alone because *Franks* intended for a inquiry into *both* intentionality and materiality in all cases). However, reckless intent is to be inferred only in extreme cases when the materiality of the omitted material is "clearly critical" to the probable cause determination.[22]

■ Applying the *Franks* analysis to this case, the Court finds that the defendants have failed to make the requisite substantial preliminary showing for an evidentiary hearing. The Court further finds that the defendants' assertion of falsity and/or intentional omission are unpersuasive and without merit in light of all of the information available to the affiant at the time he signed the affidavit. The fact that Agent Santini admitted during the trial that there were several errors in his affidavit regarding facts pertaining to payoffs to members of the Gaming Board does not change the Court's decision or require an evidentiary hearing. There was an adequate factual and good faith basis for the statements made in the affidavit at the time the affidavit was prepared and submitted to the issuing judges. The same may be said of the arguments defendants make regarding the circumstances surrounding Patrick Graham's credibility. The Court finds that the affidavits contained sufficient information about Patrick Graham's past and current criminal activity for the issuing judges to consider in determining whether to issue the warrants. The fact that a judge in Texas may now be conducting an inquiry into the circumstances surrounding the plea agreement that the government made with Patrick Graham does not affect the validity of the affidavits submitted to Judges Parker and Walter. Even if there were alleged errors or omissions in the affidavits, these alleged errors or omissions do not negate the probable cause which existed in the affidavits. In short, the Court finds that the federal agent did not "intentionally mislead," or trick, the district court into issuing the surveillance authorizations. The Court also finds there were no material misrepresentations made by the FBI agents which would have negated a probable cause finding by the two judges who issued the electronic authorizations. The Court's decision would not change even if the challenged statements were corrected

22. *Cleveland,* 964 F.Supp. at 1076–1078.

or if more information about the Grahams were included. There was sufficient information set forth in the affidavit regarding the Grahams as well as substantial corroboration of this information from other sources. The same may be said of the other challenged statements. There would have been sufficient probable cause to issue the authorizations even if the information had been corrected.

The Court now turns to an analysis of the arguments made by the parties regarding the electronic, oral and video authorizations. The Court will then discuss the validity of the searches of the homes, offices and post office boxes of the defendants.

## Motions to Suppress Fruits of Wire, Oral and Electronic Surveillance

The defendants seek to suppress the fruits of wire, oral and electronic surveillance conducted at the home and business of Cecil Brown, the home of Edwin Edwards, and the law office of Edwin and Stephen Edwards. This motion requires the Court to review the orders issued by Judge Walter of the Western District of Louisiana and Judge Parker of the Middle District of Louisiana. Each of these judges authorized separate wiretap orders which are in question in this case.

A review of the record reveals that after a very thorough investigation conducted by the FBI, the United States filed an application on June 26, 1996 for authorization to conduct a wiretap on the home and office telephones of Cecil Brown. Judge Walter granted the order on the same date. The order was extended for thirty days on July 25, 1996 and thereafter for additional thirty-day periods until February of 1997. The focus of the Brown investigation was his involvement with the Jena, Louisiana prison project. During the course of the Brown investigation, the government obtained information about Edwin Edwards. The United States then filed an application with Judge Parker on October 18, 1996 to obtain authorization to place a wiretap on Edwin Edwards' home telephone. On De-

cember 6, 1996, electronic surveillance was authorized on the law office of Edwin Edwards. Stephen Edwards was added as an interceptee at the law office the following month.

In their combined motion to suppress, the defendants challenge (1) the initial wiretap of Cecil Brown's phones; (2) the electronic surveillance of Edwin Edwards' home; (3) the electronic surveillance of Edwin Edwards' law office; and (4) the electronic surveillance of Stephen Edwards' law office. The Court will address each of these challenges separately.

## The Electronic Surveillance of Cecil Brown

### The Defendants' Contentions

The defendants challenge the June 26, 1996 order authorizing the interception of wire communications on telephones located at both Cecil Brown's residence and his place of business. The defendants assert that: (1) there was insufficient probable cause to support the order; (2) the government's application for the order failed to meet the "necessity" requirement of 18 U.S.C. § 2518(3)(c); and (3) since there was no probable cause and no "necessity," all of the evidence that was obtained as a result of the first interception order must be suppressed under a "fruit of the poisonous tree" theory.

In support of their objections to the Title III order issued by Judge Walter, the defendants argue that the affidavit contained: (1) material omissions regarding the confidential witness' (CW) credibility; (2) a lack of "any credible evidence" of payments made to Edwin Edwards with respect to the Jena Project; and (3) material omissions regarding conversations to the contrary. The defendants further argue that based on these contentions, the June 2, 1996 wiretap order was improper because it lacked probable cause. The defendants also maintain that these deficiencies represent a "substantial preliminary showing" of falsity entitling them to

an evidentiary hearing on the matter, commonly called a *Franks* hearing.

### The Government's Response

The United States contends that the affidavit clearly established the probable cause required for a judge to enter a wiretap order under Title III. The United States also argues that there were no knowing or intentional false statements or omissions in the affidavits. In short, the government contends that all relevant matters were brought to Judge Walter's attention in the affidavit and probable cause was properly found. With respect to any omitted statements, the government contends there was no attempt by the agents to mislead the court or to keep relevant information from the court. Even if the omitted statements were added to the affidavit for purposes of analysis under *Franks*, the government contends there would be no effect on the quantum of probable cause. Finally, he government argues that a *Franks* hearing is not required under the facts of this case.

### Material omissions regarding the confidential witness' (CW) credibility

The defendants argue that the government failed to fully inform the judge of the CW's unreliability and dishonesty.[23] Defendants rely in part on comments made by an Assistant United States Attorney in a bankruptcy case regarding the credibility of the CW after the June 26, 1996 order was issued. Specifically, defendants refer to a comment that the government did not believe anything the CW said unless it could be independently corroborated. Defendants contrast this with a statement in the affidavit the government submitted in support of the application which stated that during the CW's period of cooperation "he has never been known to provide false or misleading information."[24] Moreover,

defendants argue that although the statement came after the initial application was presented to Judge Walter, the statements made to the bankruptcy judge are indicative of a posture adopted by the government sometime before the application was made.

The government contends that the defendants only chose selected portions of the statement made by the Assistant United States Attorney. The relevant portions of the statement made by Assistant United States Attorney Steve Irwin to the bankruptcy court provide:

> I am defending the Grahams as good people; they are not. They're as bad as they come. Unfortunately, you know they came to us and we've been able to independently corroborate the things they tell us. And the things that we're not able to independently corroborate, we believe are lies. And that's the way it has to be when you deal with the Grahams. And thus far, we've been able to independently corroborate—including disperse monies and how the money was generated, where the money came from and where the money went, and it's not as has been portrayed to this Court at this time by the litigants here.[25]

It is clear that "an informant's 'veracity,' 'reliability' and 'basis of knowledge' are all highly relevant."[26] However, this Court finds that Judge Walter was given ample information by the United States in the affidavit about Pat Graham to raise the issue of his credibility at the time Judge Walter made his decision to issue the wiretap order. The affidavit submitted to Judge Walter clearly provides that the CW was indicted by a grand jury only three months earlier and was also "the target of [an ongoing] federal tax

---

23. *See* Rec. Doc. No. 440 at 57–61.

24. *See* Rec. Doc. No. 440 (Exh. 5b at 9).

25. Defense Exhibit 2. *See also* SA McHenry transcript, pp. 35, 36.

26. See *Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983).

and corruption investigation."[27] A judge's decision to issue a warrant based on his determination that probable cause exists is entitled to great deference.[28] The fact that a CW may be involved in criminal conduct does not disqualify that CW's statements from being considered by the Court in making its probable cause determination. This is particularly so under the totality of the facts of this case where the CW's statements were independently corroborated by other credible evidence. In this case there was substantial independent corroboration of the CW's statements. Pat Graham's statements about the Jena Prison Project were set forth in paragraphs 16 through 27 of Agent Cleveland's affidavit.[29] The FBI corroborated Pat Graham's statements through consensual recordings made by Pat Graham at the direction of the FBI. These consensual recordings include telephone conversations between Patrick Graham and Cecil Brown which occurred on May 7, 1996, May 8, 1996, May 9, 1996, June 7, 1996 and June 10, 1996. There was also a consensual recording made by Pat Graham at a May 29, 1996 crawfish boil held at Cecil Brown's residence.

A careful review of the transcripts of these conversations and the agent's description of these conversations in the affidavit reveals that the agent did not misrepresent the meaning or context of the affidavits to Judge Walter. Furthermore, to the extent there were omissions in the affidavit of statements made in the consensual recordings, this did not affect the court's finding of probable cause.

In addition to the consensual recordings, the FBI also had a copy of a piece of paper which Pat Graham brought to the May 29, 1996 crawfish boil which detailed the monetary payments which had been requested by Brown.[30] This evidence, when taken in proper context and considered with the totality of the circumstances set forth in the affidavit, demonstrated probable cause to believe that the target of this application for a wiretap has committed, was committing or will commit a crime. The affidavit also demonstrated probable cause for belief that particular communications concerning the offense would be obtained through such interception as required by 18 U.S.C. § 2518(3)(a)-(b). This Court cannot say Judge Walter erred in deciding that sufficient probable cause was present to issue this order.

**There was a sufficient showing regarding the suspected crime to support the order**

To support their argument that there were intentional misstatements and material omissions regarding the crime alleged in the application, the defendants contend that: (1) the statements of the CW were uncorroborated hearsay and could not support the order; (2) the transcript of the consensually recorded conversations between the CW and Cecil Brown reveal only innocent transactions and Edwin Edwards' "friendly interest" in Brown's compensation regarding the Jena Project; and (3) there were material omissions contained in the application that were intended to mislead the court into finding probable cause to issue the order.

27. *See* Rec. Doc. No. 440 (Exh. 5b at 9) ("A review of the various records pertaining to the CW reveals that on March 20, 1996, a District Court Grand Jury in Harris County, Texas indicted the CW for one (1) count of Money Laundering and one (1) count of Theft by Sting. This matter is pending and is scheduled for trial on July 29, 1996. The CW is also the target of a federal tax and corruption investigation in the Houston, Texas area, currently being handled by the FBI and the IRS in conjunction with the United States Attorney's Office.").

28. *United States v. Phillips,* 727 F.2d 392, 395 (5th Cir.1984) (citing *United States v. Smith,* 686 F.2d 234, 238 n. 3 (5th Cir.1982); *United States v. Freeman,* 685 F.2d 942, 948 (5th Cir.1982); *Doescher v. Estelle,* 666 F.2d 285, 289 (5th Cir.1982)).

29. *See also* Government's Exh. 1 and 2.

30. *See* Government's Exh. 5 and 7.

The defendants assert that there is no "substantial basis of credibility" supporting the hearsay statements made in the application, as required by *Illinois v. Gates*.[31] This argument is without merit under the facts of this case. The Court also notes that the defendants fail to specify which statements they are contesting. Instead, the defendants reject generally any statements made regarding the payment of money to Edwin Edwards. The defendants also fail to recognize that paragraphs 29 through 40 of the affidavit in support of the application contained summaries of consensually recorded conversations. These paragraphs alone "substantially corroborate" for the purposes of this motion any hearsay problem that might have otherwise existed. Additionally, the defendants fail to consider the pen register information that confirms various conversations between Cecil Brown and Edwin Edwards.

The defendants also allege that Edwin Edwards' involvement in the Jena Prison Project did not rise to the level of criminal behavior. They assert that Cecil Brown was merely "lobbying." Whether Edwin Edwards actually received payments is a question fact to be resolved by a jury and is not a proper issue to be addressed by the Court within the confines of a motion to suppress. Furthermore, the standard of review is one of arbitrariness. The sound discretion of the issuing judge will not be disturbed by this Court absent a more significant showing than the one presented here. There is sufficient evidence of possible criminal involvement to at least warrant the further investigation requested in the Title III application.

Finally, the defendants argue that Cecil Brown's remarks to the effect that Edwin Edwards was not getting any of the money and that it was all his were intentionally omitted from the application to mislead the court. Accordingly, the defendants assert that they are entitled to an evidentiary hearing under *Franks v. Delaware*.[32]

■ The Court summarized the requirements for a *Franks* hearing earlier in this opinion. The law in the Fifth Circuit regarding what is required to obtain a *Franks* hearing is also clear. The defendants are not entitled to an evidentiary hearing on a motion to suppress unless there are allegations that amount to a substantial preliminary showing of "deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof."[33] The Fifth Circuit has applied *Franks* to instances of omission where, as here, an affidavit falls squarely within the dictates of 18 U.S.C. § 2518.[34]

As Judge Vance noted in *United States v. Cleveland:* "The 'substantial preliminary showing' requirement set forth in *Franks* is not lightly met."[35] The proper analysis is whether the affidavit, corrected to contain the allegedly exculpatory conversation, satisfies the wiretap requirements set forth in 18 U.S.C. § 2518.[36]

The defendants have characterized the affiant's interpretation of the conversations between the CW and Cecil Brown as "creative." However, the Court finds that they were at least plausible and certainly do not rise to the level of intentional misstatements designed to mislead the court. The defendants' interpretation is not the focus of this Court's inquiry. Rather, the

**31.** 462 U.S. 213, 245, 103 S.Ct. 2317, 2335, 76 L.Ed.2d 527 (1983).

**32.** 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

**33.** *Id.* at 171, 98 S.Ct. at 2684.

**34.** *See United States v. Bankston*, 182 F.3d 296 (5th Cir.1999), *cert. granted in part by*

*Cleveland v. United States*, 529 U.S. 1017, 120 S.Ct. 1416, 146 L.Ed.2d 309 (2000) (No. 99–804).

**35.** 964 F.Supp. 1073, 1077 (E.D.La.1997) (citations omitted).

**36.** *See Bankston*, 182 F.3d at 305.

Court must determine whether, given the evidence presented, the defendants have met their substantial preliminary burden of showing the falsity of the omissions. The Court concludes they have not. Even if the Court were to find that these statements were intentionally omitted, the defendants would still not be entitled to a *Franks* hearing.

If the omitted information were included, the transcripts of various conversations would still provide substantial grounds to believe that evidence of criminal activity would be obtained through the use of electronic surveillance. The fact that Cecil Brown denies Edwin Edwards' "take" of the proceeds of this transaction in one particular excerpt does not negate the additional information in the record regarding potential criminal payoffs. Thus, there was probable cause to issue the order even when the omitted material is included in the affidavit.

**There Was "Necessity" Under 18 U.S.C. § 2518(1)(c) and 2518(3)(c)**

█ The defendants also argue that the necessity requirement of 18 U.S.C. § 2518(1)(c) and 2518(3)(c) was not met in the government's application for the initial July 26, 1996 wiretap order. Section 2518(1)(c) requires "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Section 2518(3)(c) requires the government to show and the issuing judge to find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."[37] The government need not prove exhaustion of every conceivable option before a wiretap order may issue.[38] In *United States v. Collins*, the Fifth Circuit held the following:

> [T]he purpose of [18 U.S.C. § 2518(1)(c)] "is not to foreclose electronic surveillance until every other imaginable method of investigation has been successfully attempted." *United States v. Webster*, 734 F.2d 1048, 1055 (5th Cir.1984). Rather, the section "is designed to inform the issuing judge of the difficulties involved in the use of conventional techniques and to insure that wiretapping is not resorted to in a situation in which traditional investigative techniques will suffice to expose crime." *Id.*

> With these considerations in mind, we have held that "[i]t is enough if the affidavit explains the prospective or retrospective failure of several investigative techniques that reasonably suggest themselves." *United States v. Hyde*, 574 F.2d 856, 867 (5th Cir.1978).[39]

In this circuit, the courts "take a 'common sense view' of the statements contained in the application to determine if the necessity requirement is satisfied."[40]

█ This Court finds that the application presented to Judge Walter met this standard. The affidavit stated that normal investigative techniques were either tried, used or unlikely to succeed in gathering enough evidence to prosecute the suspected activity. The affidavit also gave a detailed account of the investigative techniques used by the agents. Some of the reasons set forth in the affidavit for the necessity of the wiretap were (1) the covert nature of the offense; (2) the nature of the relationship between the parties; (3) the lack of direct physical evidence of crimes of the nature of those alleged; and (4) the lack of sufficient detail from pen

**37.** *Bankston*, 182 F.3d at 305.

**38.** *Id.; United States v. Guerra–Marez*, 928 F.2d 665, 671 (5th Cir.1991).

**39.** *United States v. Collins*, 972 F.2d 1385, 1412 (5th Cir.1992).

**40.** *United States v. Guerra–Marez*, 928 F.2d 665, 670 (5th Cir.1991), *cert. denied*, 502 U.S. 917, 112 S.Ct. 322, 116 L.Ed.2d 263 (1991) (citation omitted).

registers alone. These reasons are more than sufficient to show that the wiretap order was reasonable and necessary under the circumstances.[41]

■ Finally, the defendants argue that there was no basis for Judge Walter to grant an extension of the June 26, 1996 order. To the extent the defendants' argument is based on their contention that the original application was defective, the Court finds this argument to be without merit for the reasons previously given. The Court further finds that Judge Walter acted reasonably in extending the initial order. The Court cannot say that Judge Walter acted in an arbitrary manner in extending the original order under the facts of this case. The record clearly indicates that Judge Walter was presented with detailed oral and written progress reports every ten days which set forth the nature of the intercepted conversations. "Where the authorizing judge has required and reviewed such reports at regular intervals, a reviewing court may take such supervision through reports into consideration in determining whether a reasonable effort to minimize was attempted."[42] The record in this case reveals that Judge Walter was informed of the number of intercepted calls, the nature of the calls, the number of calls minimized and the number and type of calls the government considered to be criminal. Based on his evaluation of this information, Judge Walter concluded the government was acting in a proper manner. The affidavits, supplemented by logs, tapes and progress reports, provide more than adequate information for the issuing judge to rely on in determining whether to extend an order. A reviewing judge may also review this information in determining whether the issuing judge was arbitrary in granting extensions.

Defendants strenuously argue that since no crime was committed with respect to the Jena Project, there was no need for any extension. The Court believes that there was sufficient information presented to Judge Walter for him to conclude there was evidence of criminal activity to justify the extension of the original order. The evidence obtained by the FBI during the subsequent monitoring of the phones and other independent evidence obtained support Judge Walter's decision to grant the multiple extensions of his initial order.

This Court has no doubt that, in light of all of these considerations, Judge Walter acted in a reasonable manner in initially granting and then extending his surveillance orders. The facts clearly show that Judge Walter did not act in an arbitrary manner in extending his surveillance orders.

Considering the totality of the circumstances of this case, the Court finds:

(1) The surveillance order issued by Judge Walter on June 26, 1996 was supported by probable cause and was in compliance with 28 U.S.C. 2510–2522.

(2) There was no substantial showing made that the FBI agents knowingly and intentionally or with the reckless disregard for the truth made a false statement or caused omissions to be made in the warrant affidavits;

(3) If there were errors or omissions in the affidavit, the corrected information and/or additional information did not affect the quantum of proba-

---

41. The Fifth Circuit has affirmed wiretap orders based on similar affidavits. *See United States v. Bankston*, 182 F.3d 296, 306 (5th Cir.1999), *cert. granted in part by Cleveland v. United States*, 529 U.S. 1017, 120 S.Ct. 1416, 146 L.Ed.2d 309 (2000) (No. 99–804); *United States v. Krout*, 66 F.3d 1420, 1425 (5th Cir. 1995), *cert. denied*, 516 U.S. 1136, 116 S.Ct.

963, 133 L.Ed.2d 884 (1996); *United States v. Collins*, 972 F.2d 1385, 1412 (5th Cir.1992), *cert. denied*, 507 U.S. 1017, 113 S.Ct. 1812, 123 L.Ed.2d 444 (1993).

42. *United States v. Armocida*, 515 F.2d 29, 45 (3rd Cir.), *cert. denied*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975).

ble cause found to be present by Judge Walter.

(4) There was and is no need for a *Franks* hearing.

(5) Judge Walter was not arbitrary in issuing the June 26, 1996 order and the various extensions of the order, and

(6) The extension granted by Judge Walter were proper.

Therefore, defendants' motion to suppress evidence resulting from the June 26, 1996 surveillance orders and extensions thereof must be denied.

## The Electronic Surveillance of Edwin Edwards' Home

### Contentions of Parties

Judge Parker authorized a wiretap on Edwin Edwards' home telephone on October 18, 1996. Defendants seek to suppress any evidence obtained from this wiretap on several grounds. Defendants also challenge the validity of the surveillance order issued by Judge Walter. This contention is without merit for reasons previously given in this opinion. Additionally, defendants contend that the affidavit submitted to Judge Parker was misleading and contained errors and other mistakes.

The government acknowledges a mistake occurred regarding the June 27, 1996 telephone conversation. However, the government also contends there was sufficient evidence to establish that Edwin Edwards was using his home phone for criminal activity.

Defendants also contend in motions filed during and after the trial that Agent Santini admitted during his trial testimony that other errors or omissions were made in his affidavit. The government contends these errors and omissions do not negate the necessary probable cause which Judge Parker found when he issued his initial wiretap order.

The government also argues, and the Court agrees, that Judge Parker was provided with 10–day written and oral reports and was able to draw his own conclusion and understanding of the facts despite the errors claimed by the defendants.

### Discussion

■ The Court has previously discussed the standard by which a reviewing court evaluates whether the initiating judge was arbitrary in his decision to issue a wiretap order. This discussion will not be repeated here. After carefully considering the entire record, the Court finds that no *Franks* hearing is required under the facts of this case. The Court further finds that Judge Parker properly found there was probable cause to believe that Edwin Edwards had committed, was committing or would commit a crime and that particular communications concerning the offense would be obtained through wiretap interceptions. In short, the Court finds that Judge Parker was not arbitrary in issuing his orders under the totality of the circumstances of this case. Furthermore, the Court finds the errors or omissions which are alleged, even if corrected or added to the affidavit, would not disturb the probable cause finding made by Judge Parker.

In a separate part of this opinion, the Court sets forth in detail the standards required for searching a home. These same standards apply to the issuance of a wiretap order on a home telephone. Applying these standards to the issue now before the Court, the Court finds that there was sufficient information in Agent Santini's affidavit for Judge Parker to find probable cause to believe that Edwin Edwards used his home phone to further the Jena scheme.[43]

The affidavit submitted by Agent Santini referred to telephone conversations between Cecil Brown and Edwin Edwards which establish probable cause to believe Edwin Edwards was a participant in and

---

**43.** *See* Santini affidavit, para. 51, 54, 67 and 140.

had knowledge of Cecil Brown's scheme.[44] Furthermore, in paragraph 54 of Agent Santini's affidavit, there is a specific reference to a July 16, 1996 telephone call between Edwin Edwards and Cecil Brown on Edwin Edwards' home phone, which together with a July 14, 1996 conference between Patrick Graham and Cecil Brown suggests a scheme to pay money to Edwin Edwards on the Jena Project. There was another telephone call recorded on the Edwin Edwards home phone on October 2, 1996, which suggests evidence of criminal activity.[45] A careful review of the Santini affidavit establishes that Judge Parker did not err in concluding that Edwin Edwards was engaging in criminal activity at his home. This affidavit and the transcripts referred to in the affidavit more than established an adequate basis to obtain authorization for the installation of a wiretap on Edwin Edwards' home telephone.[46] This Court must give due deference to Judge Parker's evaluation of the evidence and his conclusion that probable cause existed to authorize the wiretap. The Court finds that Judge Parker did not act in an arbitrary manner when he signed his October 18, 1996 order.

The defendants further contend that Judge Parker erred in granting thirty-day extensions of his initial order. Defendants contend that "the federal agents sought to extend the authorization based upon a handful of intercepted communications, none of which provided evidence of illegality." [47] This claim is without merit. There were sufficient calls made during this initial thirty-day period and during subsequent periods which established criminal activity on the Jena Project, the LRGC/NORC scheme, the 15th Riverboat Scheme involving Eddie DeBartolo and the Cascade Insurance scheme.

The fact "that other criminal activity was disclosed by the communications, separate from that which provoked the surveillance, does not mean the monitoring was inappropriate." [48] Furthermore, it is clear that "the interception of conversations that may relate to offenses other than those specifically enumerated in the wiretap application and affidavit is acceptable if disclosed to the district judge." [49] The fact that other criminal activity was disclosed by the communications separate from that which provoked the wiretap order does not mean the monitoring was inappropriate. The agents cannot and should not ignore such conversations. This is particularly true "when the government reports these potentially criminal investigations to the authorizing judge, and the judge implicitly authorizes the monitoring to continue." [50] Such implied authorization satisfies the requirements of Section 2517(5).[51] Thus, where the authorizing judge receives progress reports and applications for extensions and the nature of the intercepted conversations are dis-

---

44. Santini affidavit, para. 51, 153–158; Defense Exhibit 10–B.

45. *See* Santini affidavit, pp. 66 and 67; Defense Exhibit 10–B and 11.

46. There was also evidence set forth in the affidavit regarding Edwards' intent to call Richard Stalder regarding the Jena Project. (Defense Exhibit 10–D, Santini affidavit, para. 17). There were also references to meetings held at Ruth's Chris Steak House and later at the Edwards home. (Santini affidavit, para. 74). The affidavit states that after dinner, Graham gave Cecil Brown $100,000. Cecil Brown then went to Edwards' home, according to the affidavit.

47. Defense brief, pp. 41–42.

48. *United States v. Cleveland,* 964 F.Supp. 1073, 1095 (E.D.La.1997) (quoting *United States v. Davis,* 1995 WL 608464 at *2 (E.D.La., Oct. 13, 1995)).

49. *Cleveland,* 964 F.Supp. at 1095; United States v. Masciarelli, 558 F.2d 1064, 1067 (2nd Cir.1977).

50. *Cleveland,* 964 F.Supp. at 1096–97.

51. *United States v. Cleveland,* 1997 WL 208937 at *4 (E.D.La. Apr. 28, 1997). There is a typographical error in the *Cleveland* opinion which refers to Section 2517(5) as 2817(5). The remainder of the opinion correctly cites Section 2517(5).

closed, the judge's review of the material and his acceptance of an extension constitutes a determination that the conversations were properly intercepted.[52]

Judge Parker's decision to extend his initial order was based on his review of information submitted to him which included possible criminal activity involving Jena,[53] calls from Eddie DeBartolo regarding contact with and votes of the Gaming Board,[54] and the Cascade Insurance scheme.[55] It cannot be said that Judge Parker acted in an arbitrary manner when he decided to extend the October 18, 1996 order based on the totality of the facts he had available for his review at the time he made his decision to extend the order.

The defendants also object to subsequent extensions granted by Judge Parker. The defendants argue that there was no evidence of any crime committed to justify these extensions. The defendants' arguments are not supported by the evidence. A summary of the evidence available to Judge Parker is appropriate. It is true that during the subsequent extensions, there were few calls involving the Jena and Evergreen Projects. However, there was an extensive amount of evidence involving the Hollywood/DeBartolo matter and Cascade Insurance. In fact, some of these · conversations were quoted in the indictments returned by the grand jury in the riverboat gaming case and the Cascade Insurance case. During February of 1997, conversations were intercepted involving Robert Guidry and the Treasure Chest scheme.[56]

There was a period of time from November 1996 to January 1997 when the calls were minimal because of Edwin Edwards' absence from his home and for other reasons. These facts were disclosed to Judge Parker. The fact that Edwin Edwards was temporarily absent from his home does not mean there was no probable cause for additional extensions.[57] In fact, the monitoring was terminated on January 21, 1997 and was not resumed until later in February. Giving Judge Parker the deference to which he is entitled, the Court finds there was probable cause to extend the October 18, 1996 order. Under the totality of the circumstances of this case and based on the information provided to and reviewed by Judge Parker, the Court finds Judge Parker did not act in an arbitrary manner when he initially issued and subsequently extended his surveillance order.

### The Electronic Surveillance of Edwin Edwards at his law office

The Court now turns to a discussion of the electronic surveillance which occurred at the law office located on Jamestown Avenue.

### Defendants' Arguments [58]

The defendants argue that there was no probable cause to believe Edwin Edwards' law office had been, was or would be used to commit any criminal activity. The defendants contend that the government failed to present sufficient evidence of criminal activity in the Title III application and supporting affidavit submitted to Judge Parker on December 6, 1996 to justify the surveillance order. The defen-

---

**52.** *United States v. Van Horn*, 789 F.2d 1492, 1503–04 (11th Cir.), *cert, denied,* 479 U.S. 854, 107 S.Ct. 190, 93 L.Ed.2d 123 (1986).

**53.** Defense Exhibit 10–D, Santini affidavit, para. 17–21.

**54.** Call # 6 (October 18, 1996); Call # 489 (November 6, 1996). It is true the significance of these calls was not determined until later.

**55.** The full details of this scheme were later set forth in Santini's affidavit of December 17, 1996.

**56.** Santani affidavit pars. 40–43; Defense Exhibit 10–J.

**57.** *See United States v. Van Horn*, 789 F.2d 1492 (11th Cir.), *cert, denied,* 479 U.S. 854, 107 S.Ct. 190, 93 L.Ed.2d 123 (1986).

**58.** Rec. Doc. No. 461, pp. 87–105.

dants further argue that the application and affidavit only list twelve references to activity at the Jamestown Avenue law office building. Of those twelve references, defendants contend that several involved discussions of innocuous subjects like lunch plans and travel directions. Since none of the references to meetings or conversations which occurred in the Jamestown Avenue office building suggest any criminal activity, defendants claim that the application and supporting affidavit do not satisfy the appropriate probable cause standard.

### Government's Response [59]

The government contends that there was sufficient probable cause to authorize electronic surveillance of Edwin Edwards' office. The government further argues that there was sufficient evidence of criminal activity at the law office to support the government's request for a wiretap.

### Discussion

■ The government has highlighted a number of conversations and meetings that either occurred at the law office of Edwin Edwards or were sufficiently related to the office to support probable cause. The Court has previously found sufficient probable cause for the surveillance order issued by Judge Walter on Cecil Brown's home and office. To the extent the defendants challenge the order issued by Judge Parker on December 6, 1996 on this ground, the motion is denied. There is sufficient probable cause to establish evidence of criminality insofar as the Jena and Evergreen Projects were concerned.

Furthermore, looking at the totality of the circumstances and giving due deference to Judge Parker's evaluation of the evidence before him, the Court concludes there was probable cause for Judge Parker to issue his December 6, 1996 order. The Santini affidavit refers to matters in addition to those captured on the Cecil Brown wiretaps. This includes meetings with Cecil Brown and Pat Graham on July 2, 1996 and the notation of $1,020,000 on the back of a proposed contract.[60] Furthermore, there is a reference in paragraph 47 of the Santini affidavit regarding a telephone call of October 2, 1996 between Cecil Brown and Edwin Edwards. During this phone call, there was a reference to a "75/25 heifer" discussion between Cecil Brown and Edwin Edwards as well as the Stalder discussion.[61] The government also sets forth in the Santini affidavit that a meeting was set on October 10, 1996 for the transfer of $100,000 at Ruth's Chris Steak House. The government alleges that the cash was later transferred at Edwin Edwards' home. An $8,000 check was brought to Edwin Edwards' office on October 15, 1996.[62] The inferences that can be drawn from these conversations, meetings, transfers, and other actions justify and support Judge Parker's determination of probable cause. These examples of alleged criminal activity were presented to Judge Parker as evidence of probable cause and properly formed the basis for his decision to authorize electronic surveillance of the office.

The Court concludes that there was sufficient probable cause to believe Edwin Edwards' office on Jamestown Avenue had been, was and would continue to be used for criminal activity. Taking into account the totality of the circumstances presented to Judge Parker, the Court finds that the government met its burden in establishing probable cause.[63] Therefore, the fruits of this surveillance shall not be suppressed.

**59.** Rec. Doc. No. 564, pp. 48–52.

**60.** Santini affidvit, para. 29, Defense Exhibit 12–B.

**61.** *See also* Santini affidavit, para. 49.

**62.** *See* Santini affidavit, para. 54.

**63.** *See United States v. Bankston,* 182 F.3d 296, 305–06 (5th Cir.1999), *cert. granted in part by Cleveland v. United States,* 529 U.S. 1017, 120 S.Ct. 1416, 146 L.Ed.2d 309 (2000) (No. 99–804); *United States v. Gonzales,* 866 F.2d 781, 786–87 (5th Cir.), *cert. denied,* 490 U.S. 1093, 109 S.Ct. 2438, 104 L.Ed.2d 994 (1989).

**406**

The Court previously set forth the requirements for probable cause under 18 U.S.C. § 2518.[64] The essence of the initial probable cause inquiry is a "common sense" analysis based on the entire picture presented to the authorizing judge.[65] This Court has evaluated the defendants' motion to suppress the fruits of the surveillance relative to Edwin Edwards' office and finds that the application and affidavit established a fair probability that the surveillance would yield evidence of criminal activity.[66] The Court reaches this conclusion based on the totality of all the circumstances presented to Judge Parker. Specifically, the Court is convinced that the nearly eighty paragraphs set forth in Agent Santini's supporting affidavit sufficiently detail alleged conversations, meetings and connections between Edwin Edwards, Cecil Brown and other participants to support a finding of probable cause that those persons were engaged in the alleged criminal activities listed in the Title III application.

The December 6, 1996 affidavit submitted in support of the government's Title III application described part of a broad criminal scheme that allegedly involved Edwin Edwards and some of the other named defendants, as well as other participants. Agent Santini compiled information gleaned from wiretaps conducted on defendant Cecil Brown's telephone, as well as evidence obtained from consensual recordings by a cooperating Government witness. The affidavit presented Judge Parker with information about two alleged schemes that involved bribes and illegal payments to Edwin Edwards through Cecil Brown in connection with Edwin Edwards' exerting influence based on his status as the former governor of the state of Louisiana. Agent Santini's description of these two schemes sufficiently establishes probable cause to support the Title III authorization.

Agent Santini delineated in his affidavit the scheme referred to as the "Jena Project", which involved contracts relating to the construction of a private juvenile prison in Jena, Louisiana.[67] According to Agent Santini, Cecil Brown, Edwin Edwards and the cooperating witness [68] frequently discussed Edwin Edwards' role in influencing the contract process for construction of the Jena facility.[69] On one occasion, Cecil Brown and the CW discussed payments to be made to Edwin Edwards in conjunction with Edwin Edwards' work on the Jena Project. Paragraph 26 of the affidavit describes the July 2, 1996 meeting:

> On July 2, 1996, the CW met with CECIL BROWN in Eunice, Louisiana, which was consenually recorded at the direction of FBI Agents. The purpose of the meeting was to reach an understanding as to the final payment due to EDWARDS and BROWN at the closing of the Jena Juvenile Project. During the recorded conversation BROWN and the CW came to a figure of $1,020,000 of which EDWARDS would receive $1,000,000 and BROWN would receive $20,000 in cash. This was written by the CW on the back of the original "Contract" for "services" between VIEWPOINT DEVELOPMENT CORPORATION (FRED HOFHEINZ) and LOUISIANA CONSULTANTS, INC. (CECIL BROWN). After BROWN

---

64. For a general discussion of probable cause in Title III cases, *See supra* text accompanying notes 10–19.

65. *See United States v. Hyde*, 574 F.2d 856, 863 (5th Cir.1978); *United States v. Guerra–Marez*, 928 F.2d 665, 670 (5th Cir.1991).

66. *See Gonzales*, 866 F.2d at 786.

67. Santani affidavit, para. 22–66.

68. The identity of the CW was not disclosed in the Government's Title III application (or at any point thereafter). However, in the course of filing pre-trial motions in this case, the identity of the CW was disclosed to be Patrick Graham.

69. These discussions took place in meetings or telephonically.

agreed to the amount, the contract was taken to Attorney KENNETH PITRE by BROWN and the CW which was consenually recorded. PITRE agreed to amend the contact and return it to BROWN who would take it to EDWIN W. EDWARDS for final approval.[70]

In September of 1996, Cecil Brown and the CW discussed payment of $100,000 indirectly (through Cecil Brown) to Edwin Edwards in exchange for Edwin Edwards' assistance in communicating with Richard Stalder, Secretary of the Louisiana Department of Public Safety and Corrections.[71] The confidential witness referred to this $100,000 sum as "heifers", which he planned to obtain from another business deal in Miami.[72] The reference to "heifers", or payment to Edwin Edwards indirectly, appears in the transcript of a conversation recorded between Cecil Brown and Edwin Edwards that took place on October 2, 1996: [73]

EE: Hello.

CB: Hey boss.

EE: Yeah

CB: What's going on?

EE: Not much

CB: You busy?

EE: No, I'm sorry I don't recognize your voice.

CB: Cecil.

EE: Yeah Cecil. How you?

CB: Okay. Real good. Uh, my uh, my buddy from Houston.

EE: Yeah.

CB: He, uh, we may need a phone call or something from um you to STALDER just to test the water. Uh, I'll explain to you Monday when I go.

EE: Call?

CB: Uh, do you see any problem there?

EE: Uh, I don't know. It depends on what you want me, uh, what you want me to do.

CB: Okay, I'll explain more. But, uh, what it is, its that advance that I told you about that I would get and it naturally would come back out of my pay, uh on the backside when I get paid. But it would, if we can make, I'll explain to you when I go there Monday. Are you going to be busy Monday?

EE: Well, I'm not going to be in 'til Monday afternoon.

CB: When will you be in?

EE: Uh, well I, I guess sometime early in the early afternoon Monday.

CB: Um-huh. But you're leaving early afternoon Monday?

EE: No, I'm leaving uh, tomorrow and I'm coming back Monday afternoon.

CB: Okay.

EE: Why don't you come on Tuesday morning? (October 8, 1996)

CB: Okay, good.

EE: Okay.

CB: Alright.

EE: Alright.

CB: Mighty fine. I'll explain it. It's not, it's not a big deal.

EE: Alright.

CB: Okay...anyway, on this other deal we talking about 75 heifers and 25 heifers.

EE: Alright.

CB: Okay.

EE: Okay, I'll see you Tuesday. (October 8, 1996)

CB: Yeah, that's what we had talked about.

EE: Good.

Santini believed the term "heifer" referred to cash payments.

70. Santini affidavit, para. 26.

71. Santini affidavit, para. 44–46.

72. Santini affidavit, para. 43. Based on his conversations with the confidential informant,

73. The abbreviations used in this excerpt ("EE" and "CB") refer to Edwin Edwards and Cecil Brown, respectively.

CB: Bye.[74]

Agent Santini then enumerates in his affidavit the events occurring in response to the October 2, 1996 conversation between Cecil Brown and Edwin Edwards. Cecil Brown and Edwin Edwards met on October 8, 1996 at Edwin Edwards' law office.[75] Later that same day, Cecil Brown and the CW discussed exactly what questions Edwin Edwards should ask in his conversation with Stalder, as well as assurances that Edwin Edwards would use language to convince the CW's partners that Edwin Edwards intended to exert his influence on the Jena Project.[76] The CW also expressed his concern that Edwin Edwards might "scare the people off." [77]

The Santini affidavit also lays out an alleged plan by Edwin Edwards to extort money from a Texas corporation wishing to do business in Louisiana, which is referred to as the "Evergreen Project." According to Santini's affidavit,[78] the CW and persons acting on behalf of Texas based Evergreen Global Resources Corporation ("EGR"), discussed Edwin Edwards' ability to influence state regulatory approval for EGR's projects in Louisiana and linked the approval (or lack of approval) to a payment of $500,000 payable to Edwin Edwards via Cecil Brown. In addition, the affidavit detailed another allegation that Edwin Edwards and others would receive additional extortionate payments, sometimes referred to as "points." [79]

According to the statements in Agent Santini's affidavit, Edwin Edwards and Cecil Brown attempted to conceal the Evergreen bribe payments to Edwin Edwards through Cecil Brown by using a fraudulently created contract.[80] Regarding this contract, the affidavit recounts a telephone conversation between Cecil Brown and Guy Thompson, a Houston business man believed to represent Evergreen. Santini described the July 2, 1996 conversation saying:

> Brown said he was getting heat from his partner (believed to be EDWIN EDWARDS), who said he did his part and got the thing lined up as well as New Orleans. He (EDWARDS) told Brown to get the goddamn contract over to him. BROWN told THOMPSON when he talks to him like that he does not ask him to do anything further until he (BROWN) carries out his part. * * * BROWN asked THOMPSON "once they get the plant, then some type of payments would start?" THOMPSON replied "as soon as they get one signed, sealed and delivered." (Affiant asserts that the telephone call from THOMPSON in Texas to BROWN in Louisiana in furtherance of the bribes paid to EDWARDS would be a violation of Title 18, United States Code Section 1952, and the payment of $100,000 bribe to EDWARDS, then Governor of the State of Louisiana, to allow this fraudulent scheme to go forward, would be a viola-

---

74. Santini affidavit, para. 47.

75. Santini affidavit, para. 50.

76. Santini affidavit, para. 50.

77. Santini affidavit, para. 50. Santini explained that this conversation and the reference to "scaring people off" was evidence of Edwin Edwards' intent to improperly influence the Jena Project. In this conversation, Cecil Brown was informing the CW (on behalf of Edwin Edwards) that "EDWARDS would provide proof to the CW's partners that EDWARDS could use his political influence with current Louisiana appointed or elected public officials to prevent the Jena Project from clos-

ing." In addition, Santini "asserts that the conversation corroborates the CW's information to the FBI that $75,000 of the forthcoming bribe payment will be paid to EDWARDS for EDWARDS' continuing participation in and assistance provided to the CW's Jena Project." Santini affidavit, para. 50.

78. Santini affidavit, para. 67. Santini's affidavit incorporated other affidavits by reference.

79. Santini affidavit, para. 70, 71.

80. *See* Santini affidavit, para. 76, for explanation of the attempt to conceal the bribe payments in the form of a legitimate contract.

tion of Title 18, United States Code, Section 1951.) [81]

On July 19, 1996, a conversation was intercepted on Cecil Brown's telephone which further explained the alleged use of the fraudulently created contract and the additional "points", or bribe payments, that Edwin Edwards would receive. Santini described the call as follows:

> BROWN said they got it and it's signed, sealed and delivered. BROWN said the big boss (EDWARDS) just checked it out the day before yesterday and he should have called JONES. BROWN said we got them and we got a good piece of it. JONES replied, alright and BROWN said they have five points. BROWN told JONES he would show him the contract because he (JONES) had one of the points. BROWN told JONES that he (JONES) has one of the points, his son-in-law (KARL DEROUEN) has one of the points and our friend (EDWARDS) east of here has two points. (Affiant asserts that "points" are additional monies that the victim of bribery extortion scheme (sic) are required to pay to EDWARDS, BROWN, JONES, DEROUEN and others.) [82]

The Court finds that the above references, as well as the entire factual scenario presented to Judge Parker, sufficiently established probable cause to believe that Edwin Edwards was involved in the criminal activities alleged in the December 6, 1996 application and supporting affidavit.[83] The defendants strenuously argue that there is no connection between any of the alleged criminal activity outlined in the December 6, 1996 affidavit and Edwin Edwards' law office.[84] As a result, the December 6, 1996 authorization did not satisfy the requirement that the location where the communications were to be intercepted "[were] being used, or [were] about to be used, in connection with the commission of such offense."[85] The defendants argue this is an additional reason to conclude that any evidence obtained from Edwin Edwards' office should be suppressed.

The Court finds there was a logical connection between the Jena and Evergreen schemes alleged by the government and the Jamestown Avenue office building. Edwin Edwards met with Cecil Brown at and phoned Cecil Brown from the Jamestown Avenue office building.[86] In addition, Santini asserts that other meetings relating to the Jena and Evergreen schemes occurred at other locations, but are interrelated to the meetings that took place at the Jamestown Avenue office building.[87] The Court reaches the common sense conclusion that Edwin Edwards' office was likely being used to engage in the alleged criminal activities suggested by the government. The affidavit described multiple meetings between Cecil Brown and the CW (and others) relating to the Jena and Evergreen schemes. Cecil Brown then met with Edwin Edwards and/or phoned him at the Jamestown Avenue office. It is logical to conclude that some of the meetings which were held at the Jamestown Avenue office building related to those oth-

---

81. Santini affidavit, para. 68.

82. Santini affidavit, para. 70.

83. In the December 6, 1996 application and affidavit, the Government alleged that Edwin Edwards had committed and was committing mail and wire fraud (18 U.S.C. § 1341, 1343, 1346), extortion and conspiracy to commit extortion (18 U.S.C. § 1951), Interstate Travel or transportation in aid of RICO violations (18 U.S.C. § 1952) and conspiracy to commit all of those offenses (18 U.S.C. § 371).

84. Rec. Doc. No. 78.

85. 18 U.S.C. § 2518(3)(d).

86. *See* Santini affidavit, paras. 29, 32, 34, 41, 49, 54, 65, 93, 99.

87. For example, Santini explained that a October 8, 1999 conversation between Cecil Brown and the CW regarding Edwards' call to Secretary Stalder was a direct result of a meeting that took place *at the office* earlier the same day. Santini affidavit, para. 50.

er conversations involving alleged criminal activity.[88]

As noted earlier, it is clear that Judge Parker reviewed the same evidence which this Court has reviewed and summarized. According Judge Parker the due deference to which he is entitled, and looking at the totality of the circumstances, the Court concludes that Judge Parker properly found probable cause to issue the surveillance order at Edwin Edwards' law office. Therefore, the defendants' motion to suppress the fruits of this order is denied.

**The Electronic Surveillance of Stephen Edwards**

Defendants also contend the electronic surveillance of Stephen Edwards was improper and not authorized by Judge Parker.

### Defendant's Arguments [89]

The defendants raise three arguments in support of their motion to suppress the fruits of the electronic surveillance of Stephen Edwards. First, defendants argue that the language in Judge Parker's Title III order did not authorize surveillance in Stephen Edwards' office at the Jamestown Avenue building. According to the defendants, a Title III authorization must describe with particularity the place where communications will be intercepted. Communications may not be intercepted in lo-

cations that are not authorized by the issuing judge. Defendants contend that the precise language in the December 6, 1996 order only authorized interception of communications at "the law office of Edwin W. Edwards." Based upon the phraseology used, defendants argue that this order did not permit interception of communications in any other offices, including Stephen Edwards' office. Without proper authorization, the defendants contend that the FBI illegally monitored conversations in Stephen Edwards' office. Second, the defendants argue that Judge Parker's order only authorized interception of conversations when Edwin Edwards or other named interceptees were present. According to the defendants, many conversations were recorded in Stephen Edwards' office when neither Edwin Edwards nor any of the other named interceptees were present. Therefore, defendants contend these conversations were recorded in violation of Judge Parker's order. Third, the defendants argue that even if Judge Parker's December 6, 1996 order did authorize interception in Stephen Edwards' office, the Title III application and supporting affidavit failed to provide sufficient probable cause to support the authorization. Thus, the defendants conclude that any evidence obtained from monitoring in Ste-

**88.** The defendants emphasize that Santini's affidavit only refers to the Jamestown Avenue law office twelve times and that none of those references are criminal in nature. *See* Rec. Doc. No. 461, p. 80. As a result, the defendants conclude that the Government did not properly satisfy the probable cause showing under 18 U.S.C. 2518(3)(d) and suppression is warranted. The defendants cite a number of cases for the proposition that a court should grant a suppression motion when there is no evidence linking criminal activity to the premises searched. *See* Rec. Doc. No. 461, p. 79. The cases cited by the defendants are inapposite to the issue at hand. Without exception, these cases deal with search warrants and the Fourth Amendment requirements, **not** Title III electronic surveillance orders. Admittedly, the requirements of the Fourth Amendment and the requirements of Title III are very similar. However, there are some differ-

ences. Notably, § 2518(3)(d) contains a disjunctive requirement for probable cause as it relates to the place to be searched. Section 2518(3)(d) permits the judge to authorize surveillance when there is probable cause to believe that **either** the place to be searched is being used or is about to be used in the commission of a crime, **or** if the place is listed in the name of or is commonly used by such person. Thus, even if the Court was not persuaded that Santini's affidavit presented a sufficient connection between Edwin Edwards' alleged schemes and the Jamestown Avenue office, the affidavit established that the Jamestown office was "commonly used" and "leased by" Edwin Edwards. The requirements of this section would, therefore, be satisfied.

**89.** Rec. Doc. No. 461, pp. 87–105.

phen Edwards' office should be suppressed.

### Government's Response [90]

The government argues that Judge Parker's December 6, 1996 order authorized interception of both Stephen and Edwin Edwards' office at the Jamestown Avenue office building. The government seeks to have the Court examine not only the strict language of Judge Parker's order, but also to consider the supporting affidavit submitted as part of the Title III application process. In particular, the government refers to statements in the supporting affidavit submitted by Agent Santini that informed Judge Parker that a listening device would be placed in both Stephen and Edwin Edwards' offices. The government also contends that the affidavit establishes that Edwin Edwards used different offices in the Jamestown Avenue building, including Stephen Edwards' office, to conduct business. In essence, the government urges the Court to consider the phrase "law office of Edwin Edwards" broadly as used in the December 6, 1996 order. According to the government, Judge Parker intended the term to include the offices of both Stephen and Edwin Edwards. The government also disputes the defendants' argument that the FBI did not follow Judge Parker's Title III order. The government contends that surveillance only occurred in Stephen Edwards' office when Edwin Edwards or other named interceptees were present. Finally, the government contends that the application and supporting affidavit did present probable

### Discussion

The Court has thoroughly reviewed the applicable legal standards previously set forth in this opinion, the initial Title III application, the supporting affidavit submitted to Judge Parker and the arguments of the parties. In addition, the Court has considered the closing arguments of Dan Small, counsel for Edwin Edwards, which were made during the trial of the riverboat gaming case in deciding defendants' motion for reconsideration. The Court concludes that: (1) the language of Judge Parker's December 6, 1996 order did authorize interception in Stephen Edwards' office; (2) the interception did take place in conformity with the Title III order; and (3) the application and supporting affidavit adequately set forth probable cause to support the interception order. As a result, the fruits of the electronic surveillance of Stephen Edwards' office should not be suppressed.

The Court has considered the December 6, 1996 order and the initial affidavit presented to Judge Parker in support of the Title III authorization. As will be shown below, the facts support the conclusion that the application and affidavit presented Judge Parker with sufficient probable cause to support the decision to authorize interception under Title III.[91] Additionally, Judge Parker's order authorized interception of communications in the offices of both Stephen and Edwin Edwards at the Jamestown Avenue office building.

cause sufficient to support the interception order.

**90.** Rec. Doc. No. 564, pp. 47–55.

**91.** *See United States v. Bankston*, 182 F.3d 296 (5th Cir.1999); United States v. Gaytan, 74 F.3d 545 (5th Cir.1996), *cert. granted in part by Cleveland v. United States*, 529 U.S. 1017, 120 S.Ct. 1416, 146 L.Ed.2d 309 (2000); *United States v. Collins*, 972 F.2d 1385 (5th Cir.1992), *cert. denied*, 507 U.S. 1017, 113 S.Ct. 1812, 123 L.Ed.2d 444 (1993); *United States v. Guerra–Marez*, 928 F.2d 665 (5th Cir.1991), *cert. denied*, 502 U.S. 917, 112 S.Ct. 322, 116 L.Ed.2d 263 (1991); *United States v. Ashley*, 876 F.2d 1069 (1st Cir.1989); *United States v. Lambert*, 771 F.2d 83 (6th Cir.), *cert. denied*, 474 U.S. 1034, 106 S.Ct. 598, 88 L.Ed.2d 577 (1985). It is incumbent on this Court to review the entire picture presented to Judge Parker that led to his decision to issue the December 6, 1996 order. The Fifth Circuit has indicated the request for a *Franks* type hearing implicitly involves an "exhaustive review" of the evidence and the supporting affidavits, as well as

■ Each Title III electronic surveillance application must include a "particular description" of the location where the government proposes to intercept communications.[92] This language echos the command of the Fourth Amendment which requires that warrants "particularly describ[e] the place to be searched, and the persons or things to be seized."[93] In *Maryland v. Garrison,*[94] the Supreme Court explained the requirement as follows:

> The Warrant Clause of the Fourth Amendment categorically prohibits the issuance of any warrant except one "particularly describing the place to be searched and the persons or things to be seized." The manifest purpose of this particularity requirement was to prevent general searches. By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit. Thus, the scope of a lawful search is "defined by the object

of the search and the places in which there is probable cause to believe that it may be found."[95]

The Supreme Court's decision in *Steele v. United States*[96] is often cited by courts on this issue. In *Steele,* the Supreme Court held that "[i]t is enough if the description is such that the officer with a search warrant can, with reasonable effort, ascertain and identify the place intended."[97]

Overall, the test of whether a warrant sufficiently describes the location to be searched is one of reasonableness, and "[t]echnical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area."[98]

Although a Title III application must contain a "particular description" of the premises, courts have not required that the application disclose the exact location of where devices will be placed. In *United States v. Lambert,*[99] the court found that the government was not required to disclose exactly where it intended to place a listening device in the defendant's home. The Title III application satisfied the particularity requirement by identifying the

the application submitted. *See Guerra–Marez, supra.*

92. 18 U.S.C. § 2518(1) requires that each application shall include the following:
    (b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including: (i) details as to the particular offense that has been, is being, or is about to be committed, **(ii) except as provided in subsection (11), a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted,** (iii) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted. (Emphasis supplied.)

93. Title III's particularity requirement is consistent with the particularity requirement of the Fourth Amendment. *United States v. Mesa–Rincon,* 911 F.2d 1433 (10th Cir.1990). As a result, those cases outlining the contours of the Fourth Amendment are applicable to

Title III cases. In fact, both parties acknowledge the similarity by citing both Fourth Amendment search warrant cases and Title III electronic surveillance cases in their memoranda. *See* Rec. Doc. Nos. 461 and 564. *See also* Clifford S. Fishman & Anne T. McKenna, *Wiretapping and Eavesdropping,* (2d.ed.1995) at § 1:6.

94. 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987).

95. *Id.* at 84, 107 S.Ct. at 1016. *See also* Lafave, *Search and Seizure* § 4.5(a) (3rd ed.1996).

96. 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757 (1925).

97. *Id.* at 503, 45 S.Ct. at 416.

98. *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965). *See also United States v. Darensbourg,* 520 F.2d 985 (5th Cir.1975).

99. 771 F.2d 83 (6th Cir.), *cert. denied,* 474 U.S. 1034, 106 S.Ct. 598, 88 L.Ed.2d 577 (1985).

location of the defendant's home using a street address and description of the building. The court concluded it was unwise to require any further specificity, noting:

> [J]udges [should not] be presumed to have such familiarity with the ... premises in which [listening devices] are to be installed that a court should be required in its order to specify ... the appropriate location of the bug.... Were this to be required, a judge, in consultation with law enforcement officers, might have to visit the premises to be entered and discuss ... the areas for installations. His order would then have to contain explicit directions as to how to proceed, with the risk that any deviation therefrom, created by unforeseen emergencies, would create a possibility of illegality. It would be most unseemly for the courts to invade the province of law enforcement agencies by assuming that their competence was greater than that of the agencies presumably skilled in their field.[100]

Even if the Court finds that the description of the premises in a search warrant is somewhat ambiguous, the warrant is not fatally flawed nor should the evidence automatically be suppressed.[101] In the Title III context, this principle should likewise apply. The focus of the Court's analysis should be to determine whether the Title III order gave the FBI sufficient information to determine what communications they were authorized to intercept and where they were authorized to intercept them.

■ The application procedure, including the attachments provided to Judge Parker, supports the conclusion that Judge Parker understood the design of the Jamestown Avenue office building and intended to authorize surveillance in the entire office building. Agent Santini attached a copy of the FBI schematic of the Jamestown office building to the supporting affidavit.[102] The diagram clearly showed the layout of the office building as well as the location of the individual offices located inside the building. Thus, the Edwards' offices comprised a *distinct* portion of the building.[103] The diagram indicated that Stephen and Edwin Edwards each had a distinct personal office within the Jamestown Avenue office building.[104]

The defendants vigorously argue that Judge Parker only authorized surveillance in Edwin Edwards' personal office because the December 6, 1996 order describes the premises as the "law office of Edwin Edwards." Considered in isolation, this argument seems plausible. However, when the Court examines all of the language in the application and supporting affidavit of Agent Santini, the Court concludes that this phrase should be understood more broadly to include the entire office building at 4621 Jamestown Avenue as well as the particular areas within the office described in the attachment.

First, Agent Santini drew a distinction in the supporting affidavit between the term "personal" office and the reference to the "law office of Edwin Edwards." The two are not used interchangeably and refer to different concepts. The following passage illustrates this distinction:

---

100. *Id.* at 91 n. 4 (citing *United States v. Scafidi,* 564 F.2d 633 (2d Cir.1977), *cert. denied,* 436 U.S. 903, 98 S.Ct. 2231, 56 L.Ed.2d 400 (1978)).

101. *United States v. Judd,* 889 F.2d 1410 (5th Cir.1989); *United States v. Prout,* 526 F.2d 380 (5th Cir.), *cert. denied,* 429 U.S. 840, 97 S.Ct. 114, 50 L.Ed.2d 109 (1976); *United States v. Melancon,* 462 F.2d 82 (5th Cir.), *cert. denied,* 409 U.S. 1038, 93 S.Ct. 516, 34 L.Ed.2d 487 (1972).

102. Affidavit in Support of December 6, 1996 Application, Attachment "1."

103. *Id.* Emphasis supplied by the United States.

104. *Id. See also,* Government's brief, p.50 n.38.

On December 3, 1996, a separate cooperating witness (CW–3) advised that if an individual entered the front door of the law office and turned right at the reception desk, the first office on the right is the personal office of STEPHEN R. EDWARDS. The next office on the right down the hall is the personal office of **EDWIN EDWARDS**. (Affiant asserts that EDWIN W. EDWARDS' office is located in the front corner of the law office). CW–3 advised that **EDWIN W. EDWARDS** currently conducts business in his personal office and on occasion in the office of STEPHEN R. EDWARDS. Monitoring devices will be placed in both offices, however, monitoring will only take place when EDWIN W. EDWARDS is present in one of the offices. (Attached hereto as "Attachment 1" is a diagram of the law office which was provided by the CW.) [105]

As shown in the above passage, Agent Santini refers to "the law office" in a broad sense referring to the entire building on Jamestown Avenue. References by Agent Santini to the "personal offices" are references to the individual offices contained within the building itself. It is evident that Judge Parker recognized this distinction in the December 6, 1996 order, wherein he utilizes the broader term "law office" as opposed to the narrower term "personal" office.

Second, during oral argument, the defendants urged the Court to closely examine the language of Judge Parker's December 6, 1996 order.[106] They argued that this order authorized access to the entire "law office" only for the purposes of installing, maintaining, and removing the equipment, and not for intercepting conversations in Stephen Edwards' office. Implicit within the defendants' argument is the presumption that the term "law office" refers to the entire building, not just to the personal offices of Edwin or Stephen Edwards. Based on the facts as well as counsel's arguments during the hearing on November 11, 1999, the Court concludes that the December 6, 1996 order authorized installation, maintenance, removal, *and monitoring* in both Edwin and Stephen Edwards' personal offices in the Jamestown Avenue office building.[107]

The government presented Judge Parker with the affidavit of Agent Santini in support of its December 6, 1996 application for electronic surveillance.[108] Agent Santini's affidavit informed Judge Parker that a listening device would be placed in Stephen Edwards' office at the Jamestown Avenue office building. In pertinent part, the affidavit provides:

> CW–3 advised that **EDWIN W. EDWARDS** currently conducts business in his personal office and on occasion in the office of STEPHEN R. EDWARDS. Monitoring devices will be placed in both offices, however, monitoring will only take place when **EDWIN W. EDWARDS** is present in one of the offices. (Attached hereto as "Attachment 1" is a

---

**105.** *Affidavit in Support of December 6, 1996 Application*, para. 107, p. 64.

**106.** Hearing on Defendants' Motion to Suppress, November 11, 1999.

**107.** It is clear that the government does not have to pinpoint the exact location of the intercepted conversations, but may identify the general location of the conversations. *United States v. Mesa–Rincon*, 911 F.2d 1433, 1440 (10th Cir.1990).

**108.** Agent Santini had personal knowledge of a number of facts that make his affidavit highly relevant. First, he had knowledge about the ongoing federal investigation of Edwin Edwards, Cecil Brown and others. *See* Affidavit in Support of December 6, 1996 Application, Government Exhibit 12(b), para. 3. Second, he was aware of the identities of those persons being investigated and those having offices in the Jamestown Avenue building. *See* Affidavit in Support of December 6, 1996 Application, Government Exhibit 12(b), paras. 17–20. Third, Agent Santini was familiar with the layout of the Jamestown Avenue office. *See* Affidavit in Support of December 6, 1996 Application, para. 107, Attachment "1" (diagram of Jamestown Avenue office).

diagram of the law office which was provided by the CW.)[109]

Despite the defendants' arguments to the contrary during the hearing held on November 11, 1999, Judge Parker clearly had knowledge that a listening device would be placed in Stephen Edwards' office. The defendants complain that because the December 6, 1996 order did not incorporate any language from Paragraph 107 of Santini's affidavit, Judge Parker could not have intended to authorize surveillance in Stephen Edward's office.[110] This argument is not persuasive. The jurisprudence unequivocally provides that both the authorizing judge and the reviewing judge must consider the totality of the circumstances presented by the Title III applicant, including the application itself and the supporting affidavits.[111] In the instant case, Judge Parker evaluated all the relevant facts in deciding to issue the December 6, 1996 interception order.[112]

Agent Santini's choice of terminology supports the position that Judge Parker authorized surveillance in the personal offices of both Stephen and Edwin Edwards. Santini stated that "monitoring devices will be placed in both offices."[113] His use of the plural "devices" is further evidence that Judge Parker's order authorized the FBI to monitor communications in both offices. If the phrase "monitoring devices" is interpreted in isolation, a plausible explanation could be that the order authorized the FBI to place multiple devices within Edwin Edwards' personal office. However, the entire sentence supports a different conclusion. The Court finds that Judge Parker intended to authorize multiple devices because the surveillance would be conducted *in both offices.*

Agent Santini's affidavit also contains several relevant points to support the conclusion that Edwin Edwards used other offices in the Jamestown Avenue building. Santini states that on one occasion, Edwin Edwards made a call to Cecil Brown from the phone located in Stephen Edwards' personal office.[114] In addition, Santini states that "CW-3 advised that Edwin Edwards currently conducts business in his personal office and on occasion in the office of Stephen Edwards."[115] Clearly, Judge Parker was presented with information supporting the conclusion that Edwin Edwards conducted business in both his personal office and the personal office of Stephen Edwards.

This Court's conclusion is also supported by the closing argument Dan Small made to the jury at the close of the trial.[116]

Mr. Small argued:[117]

his responsibilities, and clearly supervised his orders.

**109.** Affidavit in Support of December 6, 1996 Application, para. 107, p. 64.

**110.** Memorandum in Support of Defendants' Motion to Suppress Fruits of Wire, Oral and Electronic Surveillance, Rec. Doc. No 461, p. 89.

**111.** *See supra* note 18.

**112.** The defendants charged that the government deliberately attempted to mislead Judge Parker by burying the reference to placing the device in Stephen Edwards' office in the supporting affidavit. *See* Rec. Doc. No. 461, pp. 89–90. In addition, the defendants also intimate that Judge Parker may have overlooked Agent Santini's statement about monitoring Stephen Edwards' office. The defendants offer no support for either of these allegations. The Court believes the totality of this record shows that Judge Parker was very attentive to

**113.** Santini affidavit in Support of December 6, 1996 Application, p. 64, para. 107.

**114.** Affidavit in Support of December 6, 1996 Application, para. 52, p. 26.

**115.** Affidavit in Support of December 6, 1996 Application, para. 107, p. 64. CW-3 was personally familiar with the layout of the Jamestown law office. According to Santini's affidavit, the confidential witness (Graham) discussed business in Edwards' personal office on multiple occasions. *See* Santini Affidavit, p. 63 n.9.

**116.** Closing arguments, April 19, 2000.

**117.** The description given by Mr. Small of the offices and method of operation Edwin Ed-

And then there's much ado that there's a fingerprint on an envelope. The government just ignores the facts on tapes that show Stephen Edwards and Edwin Edwards shared offices, shared office supplies. You hear from the tape they are back and forth from each other's offices all the time.

Judge Parker authorized the FBI to use all interior areas of the Jamestown office building to carry out its electronic surveillance of Edwin Edwards and the other named interceptees. In the December 6, 1996 order, Judge Parker authorized the following:

> IT IS FURTHER ORDERED that Special agents of the FBI are authorized to obtain access to all interior areas of the premises known as the law office of Edwin W. Edwards, located at 4621 Jamestown Avenue Baton Rouge, Louisiana either openly or by surreptitious and covert means, as many times as is deemed necessary for the purpose of installing, maintaining, repairing and eventually removing electronic equipment which will permit interception of oral communications and for the purpose of ensuring effective interception, transmission, and recording of oral communications occurring at the above described location .... [118]

Defendants argued during the hearing held on November 11, 1999 that Judge Parker authorized access to the entire premises solely for the purposes of installing, maintaining and repairing the equipment. According to the defendants, this authorization did not extend to recording or monitoring communications. The Court rejects this argument. To adopt defendants' argument would require an awkward reading of Judge Parker's order. The Court finds that it is illogical to interpret the phrase "law office of Edwin Edwards" as permitting access to the entire premises for installation, maintenance and removal purposes, while interpreting the same phrase as only referring to Edwin Edwards' personal office for monitoring purposes. The facts also dispute such a reading of the order.

Despite the defendants' attempts to analogize the Jamestown Avenue office building to an apartment building or similar type of building, the Court finds that describing the building as the "law office of Edwin Edwards" was sufficiently particular to satisfy Title III requirements. The defendants compare the structure of the Jamestown Avenue office building to a multiple tenant apartment building or a similar multi-tenant building.[119] Consequently, the defendants rely upon jurisprudence that requires a warrant to particularize which unit or apartment within a multi-unit building will be searched. The diagram submitted with Santini's affidavit is contrary to this analogy. The Court believes there is a distinction between multi-unit buildings with completely separate entrances and the building at issue in the present case. As the diagram indicates, the Jamestown Avenue office building is not subdivided into multiple units. The tenants in the Jamestown Avenue building share a common entrance, as well as other common facilities such as a library, a kitchen and a secretarial area.[120]

wards and Stephen Edwards had at the law office on Jamestown Avenue is completely consistent with Judge Parker's order and the government's arguments made in response to defendants' motions.

**118.** Order Authorizing the Interception of Oral Communications, December 6, 1996, p. 4.

**119.** Rec Doc. No. 461, pp. 100–101.

**120.** The multi-tenant and apartment cases cited by the defendants are distinguishable. For example, in *United States v. Votteller*, 544 F.2d 1355 (6th Cir.1976), the court found that a motion to suppress should have been granted because the order failed to particularly describe the location to be searched. The premises searched in *Votteller* stand in stark contrast to the premises in the present case. *Votteller* involved a three story building with a bar on the first floor and multiple apartments on the other two floors. Similarly, the Sec-

Defendants also argue that the government failed to abide by certain restrictions set forth in the December 6, 1996 order, thus warranting suppression. Judge Parker's order contained the following limits on interception:

IT IS FURTHER ORDERED that the interception of oral conversations that occur within the target premises take place only when one of the named interceptees are within the target premises and are engaged in conversation or activity with any named or known coconspirator or any other individual that was caused to go to the target premises by a named interceptee or named or known coconspirator as related to the criminal offenses as set forth in Paragraph A.[121]

The government contends that only two relevant conversations involving Stephen Edwards were recorded in the first ten days following the effective date of Judge Parker's December 6, 1996 authorization.[122] Thereafter, Judge Parker authorized the government to continue intercepting conversations of Stephen Edwards, irrespective of whether Edwin Edwards or any other named interceptee was present in the office.[123] The government maintains that during the first ten days of the authorization, there were only two pertinent conversations recorded in which Stephen Edwards was a participant. These occurred on December 19, 1996 and Decem-

ber 20, 1996. According to the government, the December 19 conversation was properly intercepted because it involved Edwin and Stephen Edwards. The December 20 conversation was properly intercepted because it involved three named interceptees and Stephen Edwards. Upon the filing of the first ten-day report to Judge Parker on December 27, 1996, Judge Parker was informed of Stephen Edwards' status as a co-conspirator. Judge Parker orally authorized the government to monitor conversations in Stephen Edwards' office regardless of Edwin Edwards' presence.[124] As to any conversations recorded after December 27, the government maintains the recordings were authorized by Judge Parker's December 27 oral authorization to continue intercepting communications in Stephen Edwards' office regardless of whether Edwin Edwards or any other named interceptees were present. On January 15, 1997, the first 30-day extension was granted and Stephen Edwards was named as an interceptee.

The defendants also argue that there was no probable cause to believe that any of the offices in the Jamestown Avenue office building, including Stephen Edwards' office, had been, was or would be used for criminal activity. Consequently, even if the wording of Judge Parker's December 6, 1996 order permitted interception in Stephen Edwards' office, there

ond Circuit invalidated a search where the description of the premises only referred to a street address. The court reasoned that the description failed to allow the officers to distinguish between a clothing store on the ground floor of the building and the apartments located on the upper floors. *United States v. Bermudez*, 526 F.2d 89 (2nd Cir.), *cert. denied*, 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1975). The cases cited by the defendants are not applicable under the facts of this case.

**121.** December 6, 1996 Title III order issued by Judge Parker, p. 4, submitted as Government's exhibit 12(c).

**122.** Judge Parker's order, although signed on December 6, 1996, was not effective until December 16, 1996. No recording took place until that date. As a result, the conversations

the defendants object to took place within the first ten days of the authorization.

**123.** Government's Response in Opposition to Defendants' Motion to Suppress Wiretap Evidence and Request for an Evidentiary Hearing, Rec Doc. No. 564, p. 53.

**124.** *See United States v. Cleveland*, 964 F.Supp. 1073 (E.D.La.1997), *aff'd* 182 F.3d 296 (5th Cir.1999), where the broadened scope of the investigation was implicitly authorized where the supervising judge was advised of progress of the investigation through detailed progress reports. *See also United States v. Van Horn*, 789 F.2d 1492, 1503–04 (11th Cir.), *cert. denied*, 479 U.S. 854, 107 S.Ct. 190, 93 L.Ed.2d 123 (1986).

was no probable cause to issue the Title III order.

The Court has previously addressed the standard for probable cause. The Court finds that there was adequate probable cause to support Judge Parker's decision to issue the December 6, 1996 intercept order. The defendants attempt to divide the probable cause inquiry. First, defendants argue that no probable cause existed to support interception anywhere in the Jamestown Avenue office, thereby precluding any basis for intercepting conversations in Stephen Edwards' office. Second, defendants argue that there was no independent probable cause to support interception in Stephen Edwards' personal office. Under either argument, the defendants conclude that the interceptions in Stephen Edwards' office were illegal, and that the fruits of the surveillance should be suppressed.

The Court sees no reason to divide the probable cause inquiry as the defendants suggest. There was adequate probable cause to support electronic surveillance in both Edwin and Stephen Edwards' offices. Judge Parker's determination is adequately supported by the record. The affidavit contains references to multiple conversations that took place at the Jamestown Avenue office between Edwin Edwards, Cecil Brown and Patrick Graham. These conversations support a finding of probable cause that criminal activity had and was taking place and would continue to take place at the law office. The Court finds that the affidavit supporting the application sufficiently satisfied probable cause based upon the totality of the circumstances presented to Judge Parker.

The Court need not reach the issue of whether the facts supported independent probable cause for Stephen Edwards' office alone. There was sufficient probable cause to believe that Edwin Edwards was conducting criminal activity in the Jamestown Avenue office building. The December 6, 1996 affidavit and Mr. Small's closing argument established that Edwin Edwards at times used other areas in the Jamestown Avenue office building to conduct meetings and make and receive telephone calls. Therefore, Judge Parker's order properly authorized interception in Stephen Edwards' office as one of those "other" offices.

In summary, the Court finds that the motion to suppress evidence obtained from the monitoring of Stephen Edwards' conversations must be denied.

The Court will now turn to a discussion of the motions to suppress evidence seized pursuant to search warrants issued by Judge Parker.

**The Searches of the Residences of Edwin Edwards and Stephen Edwards, of the Office at 4621 Jamestown Avenue, and the Safe Deposit Boxes at Regions Bank and City National Bank**

Edwin Edwards and Stephen Edwards challenge the validity of the search warrants issued for the searches of their residences, the office at 4621 Jamestown Avenue, and safe deposit boxes located at Regions Bank and City National Bank. A brief recitation of the facts is in order.

On April 26, 1997, Judge Parker signed warrants authorizing the search of the residences of Stephen Edwards and Edwin Edwards, and "the office located at 4621 Jamestown Avenue." On April 26, 1997, Judge Walter also authorized the execution of search warrants on the home and office of Cecil Brown and the law office of Cecil Brown's attorney, Ken Pitre. Items authorized to be seized in the Edwards' warrants included business records, bank records, computer data, records of real estate transactions, phone records, and currency or legal tender. While conducting the search of Stephen Edwards' residence, FBI agents discovered a free standing safe. Within the safe, they found a key to a safe deposit box located at Regions Bank. On April 29, 1997, Judge Parker signed a search authorizing the search of this safe deposit box. During the search of Edwin Edwards' residence, FBI

agents discovered a "Maximum Security Corporation" free standing safe. Within this safe was a key to a safe deposit box located at City National Bank. On April 29, 1997, Judge Parker issued a warrant authorizing the search of that safe deposit box.

Stephen Edwards and Edwin Edwards have filed a motion to suppress all fruits of the aforementioned search warrants on the following grounds: (1) the affidavits in support of the applications contained falsities regarding the reliability of the confidential informant; (2) the affidavit in support of the warrant to search Stephen Edwards' residence did not establish probable cause because there was an insufficient nexus between the residence and the items sought; (3) because the warrant for the search of Stephen Edwards' residence lacked probable cause, the items seized in the safe deposit box at Regions Bank should also be suppressed as fruits of the poisonous tree; (4) the affidavit in support of the warrant for the search of Stephen Edwards' office did not establish probable cause because the location was not adequately particularized and because there was an insufficient nexus between the office and the items sought; (5) there was no probable cause to search Edwin Edwards' residence because there was no nexus between the residence and the evidence sought; (6) because the warrant for the search of Edwin Edwards' residence lacked probable cause, the items seized in the safe deposit box at City National Bank should be suppressed as fruits of the poisonous tree; and (7) the office of Edwin Edwards was not described with sufficient particularity in the search warrant.

### Legal Standards—Search of a Residence and Office

The Court has already set forth the standards for probable cause earlier in this opinion. That discussion will not be repeated here. The Court will discuss additional factors which are required for the search of a person's residence or office.

In *United States v. Freeman*,[125] the Fifth Circuit set forth standards to determine when the search of a person's residence is constitutional under the Fourth Amendment. The mere fact that there is probable cause to believe that a person committed a crime does not in and of itself constitute probable cause to search his residence or office for evidence of that crime.[126] The *Freeman* court stated that a nexus must also exist between the residence and the items sought in the search warrant. The Fifth Circuit stated:

> We have consistently held that facts must exist in the affidavit which establish a nexus between the house to be searched and the evidence sought... However, that nexus may be established either through direct observation or through normal inferences as to where the articles sought would be located... In [*United States v. Maestas*], we explained:
>
> > The affidavit need not contain information providing certainty that the objects sought will be found as a result of the search. It is only necessary that "the facts and circumstances described in the affidavit would warrant a man of reasonable caution to believe that the articles sought are located" at the place where it was proposed to search.[127]

The nexus requirement to search a home applies equally to the search of a person's office.

The defendants contend that since the court in *Freeman* refused to uphold the warrant, *Freeman* requires a similar result in this case. The defendants' contention is without merit. It is true that *Freeman* requires that the affidavit establish a nexus between the house or office to be

---

**125.** 685 F.2d 942 (5th Cir.1982).

**126.** *Id.* at 949.

**127.** *Freeman*, 685 F.2d at 949 (citations omitted).

searched and the evidence sought. "That nexus may be established, however, by direct observation or through normal inferences as to where the articles sought would be located."[128] While the evidence provided in the affidavit in *Freeman* connecting the defendant's activities to his home was too tenuous to support a finding of probable cause, that case does not prohibit all searches of homes or offices. In fact, in *Freeman,* the court concluded that "there *was* probable cause to search for passports, personal identification papers and bank and safety deposit box records because these were 'precisely the sorts of items which people tend to keep at home among their personal papers and effects.'"[129] In *United States v. Maestas,*[130] the Fifth Circuit found that the fact that the defendant's accomplice sent materials to the defendant's home as part of a counterfeiting scheme combined with the reasonable inference that people keep mail at the house supported probable cause to search the defendant's home for mail connected with the scheme. "The affidavit must connect (in a manner more convincing than in *Freeman* ) the residence to be searched with the illegal activity, but this nexus may be established 'through normal inferences as to where the articles sought would be located.'"[131] "Probable cause involves a practical, commonsense determination by a neutral judicial officer whether the information provided represents a basis for believing crime has been committed."[132] "The justification for allowing a search of a person's residence when that person is suspected of criminal activity is the common-sense realization that one

tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained."[133] The *Green* court further noted that in "normal situations, few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime."[134] While this notation "does not provide carte blanche for searching a home when one is suspected of illegal activity,"[135] concealment of the type of records sought in the search warrants in this case from the defendants' residences and offices certainly can be reasonably inferred from the facts set forth in the affidavits filed with Judges Parker and Walter. Each case involving the validity of a search requires a determination of whether probable cause exists to authorize the search which is fact intensive and depends on the facts and circumstances of the particular case.

█ In this case, probable cause was clearly established in the affidavits submitted to the authorizing judges. The affidavits describe a sufficient connection between the illegal activity and the expectation of what would be found at the residences and offices to give rise to probable cause to search the homes and offices in question. Furthermore, there was a reasonable inference which could be drawn from the facts set forth in the affidavits which supported Judges Parker and Walter's determination of probable cause to search the residences and offices. An important fact exists in this case that was not involved in *Freeman.* In this case,

---

128. *United States v. Broussard,* 80 F.3d 1025, 1034 (5th Cir.1996).

129. *United States v. Pace,* 955 F.2d 270, 277 (5th Cir.1992) (quoting*Freeman,* 685 F.2d at 949).

130. 546 F.2d 1177 (5th Cir.1977).

131. *Pace,* 955 F.2d at 277 (internal citations omitted); *See also United States v. Minis,* 666 F.2d 134 (5th Cir.), *cert. denied,* 456 U.S. 946, 102 S.Ct. 2013, 72 L.Ed.2d 469 (1982).

132. *Pace,* 955 F.2d at 277.

133. *United States v. Green,* 634 F.2d 222, 226 (5th Cir.1981).

134. *Id.*

135. *United States v. Pace,* 955 F.2d 270, 277 (5th Cir.1992).

there was a continuing criminal activity that was ongoing up to the time the warrants were executed. The nature of the criminal activity alleged in this case and set forth in the affidavits was sufficient for Judges Parker and Walter to conclude that the records sought would be found at the residences and offices of Edwin Edwards, Stephen Edwards and Cecil Brown.

The affidavit prepared by Agent Santini[136] contained numerous references to conversations obtained as a result of wiretaps which had been previously authorized by Judges Parker and Walter. These conversations which are set forth in detail in the affidavit refer to schemes involving the Jena Project,[137] the Treasure Chest Casino,[138] the Players Riverboat Casino,[139] the 15th Riverboat License,[140] New Orleans Riverboat Corporation,[141] Evergreen Global Resources,[142] and Cascade Insurance.[143] The details of these conversations and the other facts included in these affidavits set forth sufficient information to establish a reasonable inference that criminal activity was occurring at the residences and offices of Stephen Edwards, Edwin Edwards and Cecil Brown. There was also sufficient information to conclude the documents sought in the search warrants would be found at those places.

In *United States v. Gann,*[144] the Ninth Circuit held that a number of factors should be considered to determine whether there is a sufficient nexus between the place to be searched and the evidence sought. The court stated that the required nexus "rests not only on direct observation, but on the type of crime, the nature of missing items, the extent of the suspects' opportunity for concealment, and normal inferences as to where a criminal would be likely to hide stolen property."[145] In the present case, based upon the ongoing criminal activity allegedly occurring on the part of Stephen Edwards, Edwin Edwards, Cecil Brown and other co-conspirators, the government believed that numerous business records, as well as U.S. currency, were generated and were continuing to be generated at their residences and offices. It is logical to infer that the types of items sought—business records, bank account statements, phone records and currency—would be stored at Stephen Edwards' and Edwin Edwards' offices or residences located in Baton Rouge, the same city in which the alleged criminal activity occurred. The same can be said for Cecil Brown's residence and office located in Eunice.

The defendants' contention that there were false statements in Agent Santini's supporting affidavit was discussed in some detail earlier in this opinion. The defendants argue that the government denied the judges issuing the June 26, 1996 orders the opportunity to fully consider the facts presented to them because the government failed to fully inform the court of the CW's unreliability and dishonesty.[146] In doing so, defendants again rely on comments made *after the orders were issued* by an Assistant United States Attorney in a bankruptcy case regarding the credibility of the CW. The defendants contrast this with a statement in the affidavit submitted in support of the application for the order which states that during the CW's period

**136.** Defense Exhibit 9.

**137.** Santini affidavit, p. 7.

**138.** Santini affidavit, p. 55.

**139.** Santini affidavit, p. 64.

**140.** Santini affidavit, p. 83.

**141.** Santini affidavit, p. 112.

**142.** Santini affidavit, p. 129.

**143.** Santini affidavit, p. 158.

**144.** 732 F.2d 714 (9th Cir.), *cert. denied,* 469 U.S. 1034, 105 S.Ct. 505, 83 L.Ed.2d 397 (1984).

**145.** *Id.* at 722.

**146.** *See* Rec. Doc. No. 440 at 57–61.

of cooperation "he has never been known to provide false or misleading information." [147] Moreover, defendants argue that although the statement came after the initial application, the statements made to the bankruptcy judge are indicative of a posture adopted the government sometime before the application was made. These contentions are without merit for the reasons previously set forth herein.

"[A]n informant's 'veracity,' 'reliability' and 'basis of knowledge' are all highly relevant...." [148] However, this Court finds that the issuing judges were given ample information to raise the issue of the CW's credibility at the time they made their decisions to issue the search warrants. The affidavits submitted to the courts clearly indicate that the CW had been indicted by a grand jury only three months earlier and was also "the target of [an ongoing] federal tax and corruption investigation...." [149] No further discussion is required on this issue.

### Search of Stephen Edwards' Residence

Stephen Edwards also argues that the statements regarding "the five thing" is the **only** alleged fact supporting probable cause to search his home. First, Stephen Edwards contends that there is no basis to conclude that "the five thing" refers to money. Second, even if it does refer to money, Stephen Edwards argues that this statement standing alone is insufficient to establish probable cause. Regardless of whether "the five thing" was in fact cash, the defendant's argument is misplaced. It

is improper to consider this conversation in a vacuum. This conversation is one factor in support of probable cause to believe that at least some of the money allegedly received by Stephen Edwards as a result of a number of extortion and bribery schemes being investigated was being stored at his residence.

In *United States v. Pofahl,*[150] the Fifth Circuit found that the search warrant issued in that case "was supported by specific, concrete facts" rather than an assumption standing alone.[151] In the present case, the conversation involving "the five thing" is a "specific, concrete fact" linking Stephen Edwards' residence to fruits and instrumentalities of the alleged criminal activity, which serves to strengthen the required nexus.

In *United States v. Maestas,* the Fifth Circuit was careful to note that "firsthand evidence in the affidavit" that the materials subject to seizure are on the premises to be searched "is not always necessary." [152] The court further stated that "evidence that a defendant has stolen material which one normally would expect him to hide at his residence will support a search of his residence." [153] The Fifth Circuit then described the appropriate standard to be applied to the issuing judge's determination of probable cause:

The affidavit need not contain information providing certainty that the objects sought will be found as a result of the search. It is only necessary that "the facts and circumstances described in the

**147.** *See* Rec. Doc. No. 440 (Exh. 5b at 9).

**148.** *See Illinois v. Gates,* 462 U.S. 213, 230, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983).

**149.** *See* Rec. Doc. No. 440 (Exh. 5b at 9) ("A review of the various records pertaining to the CW reveals that on March 20, 1996, a District Court Grand Jury in Harris County, Texas indicted the CW for one (1) count of Money Laundering and one (1) count of Theft by Sting. This matter is pending and is scheduled for trial on July 29, 1996. The CW is also the target of a federal tax and corruption investigation in the Houston, Texas area,

currently being handled by the FBI and IRS in conjunction with the United States Attorney's Office.")

**150.** 990 F.2d 1456 (5th Cir.1993).

**151.** *Id.* at 1475. *See also United States v. Broussard,* 80 F.3d 1025 (5th Cir.1996) (specific facts linking defendant and the residence to the items sought).

**152.** 546 F.2d 1177, 1180 (5th Cir.1977).

**153.** *Id.* (citations omitted).

affidavit would **warrant a man of reasonable caution to believe** that the articles sought were located" at the place where it was proposed to search. It is axiomatic that an affidavit for [a] search warrant is to be interpreted in a common sense and realistic manner, and the magistrate's finding of **probable cause should be sustained in doubtful or marginal cases.**[154]

As previously stated, much of the alleged criminal activity in the present case occurred in Baton Rouge, the same city in which Stephen Edwards resides. The nature of the alleged criminal activity (extortion and bribery), the fruits produced (currency and documents), and the "understanding" on the part of Edwin Edwards that Stephen Edwards stored "the five thing" at his home all support a finding of probable cause to believe that fruits of the alleged criminal activity would be found at the residence of Stephen Edwards. The link between the items sought and the residence sought to be searched is more than an inference. The conversation between Edwin and Stephen Edwards referencing "the five thing" provides a direct link between Stephen Edwards' home and the alleged conspiracy involving extortion and bribery.[155]

██ Stephen Edwards also raises the issue of staleness of the aforementioned conversation between himself and Edwin Edwards. The referenced conversation took place on March 9, 1997, and the search warrant was issued by Judge Parker on April 26, 1997. In *United States v. Robins*, the Fifth Circuit held that staleness of the underlying information must be decided on the particular facts of each case, and a "mechanical count of days is of little assistance" in the determination.[156] **"Fairly long periods of time are allowed to elapse between information and a search warrant in cases where the evidence clearly shows ... a longstanding, on-going pattern of criminal activity."** [157] A similar conclusion was reached in *United States v. Cherna.*[158] Given the allegations of longstanding, ongoing criminal activity cited in Agent Santini's supporting affidavit, the Court finds the defendant's staleness argument is without merit.

This Court concludes that it was reasonable for Judge Parker to conclude that there was probable cause to believe that the items sought would be found at the home of Stephen Edwards. Agent Santini's affidavit alleges conspiracies involving extortion and bribery which were ongoing at the time the search warrant was issued. Stephen Edwards' residence was located in

154. *Id.* (citations omitted) (emphasis provided). This Court is aware that the decision in *Maestas* was rendered prior to the Supreme Court's decision in *Illinois v. Gates.* However, the reasoning in *Maestas* was not altered by *Gates.*

155. The Court notes the decision in *United States v. Humphrey*, 104 F.3d 65 (5th Cir.), *cert. denied*, 520 U.S. 1235, 117 S.Ct. 1833, 137 L.Ed.2d 1038 (1997), wherein an **"all records" search** was upheld. Four factors were cited in support of the decision: (1) the fraud was pervasive; (2) there was considerable overlap of the Humphreys' business and personal lives; (3) the residence was the primary place of business; and (4) the defendants maintained no known bank accounts. Defendant attempts to factually distinguish the present case, asserting that Stephen Edwards' residence was not his primary place of

business. While that is true, the warrant in the present case did **not** involve a generic, "all records search." The Fifth Circuit pointed out that "the Fourth Amendment requires much closer scrutiny of an all records search of a residence." *Id.* at 69.

156. 978 F.2d 881, 892 (5th Cir.1992) (citing *United States v. Hyde*, 574 F.2d 856, 865 (5th Cir.1978)).

157. *Id.* at 892 (emphasis provided).

158. 184 F.3d 403 (5th Cir.1999), *cert. denied*, 529 U.S. 1065, 120 S.Ct. 1669, 146 L.Ed.2d 479 (2000) (when information shows a longstanding, ongoing pattern of criminal activity, the information need not be regarded as stale even if fairly long periods of time have elapsed between the information and the issuance of the warrant) (citing *United States v. Webster*, 734 F.2d 1048, 1056 (5th Cir.1984)).

the same city where the alleged criminal activity was occurring. The phone call from Edwin Edwards at his home to Stephen Edwards at his home in which he asked Stephen to "bring the five thing" to the office the next day because he needed to "pass it on to someone" is significant. Based upon Stephen Edwards' affirmative response, it was a reasonable, common-sense conclusion for Judge Parker to draw that Stephen Edwards was concealing at least some of the fruits of the alleged extortion and bribery at his home. It is of no moment to argue that "the five thing" was no longer at the residence, assuming Stephen followed through with Edwin Edwards' request to bring "the five thing" to the office. What remains is the logical inference that Stephen Edwards concealed items at his home related to the alleged criminal activities. Edwin Edwards did not ask that Stephen first retrieve "the five thing" from the office, or whether Stephen had "the five thing" at his home. Implicit in Edwin Edwards' request was his knowledge that Stephen was storing the cash at his home. Giving "great deference" to the issuing judge's determination of probable cause, and considering the totality of circumstances presented to Judge Parker, this Court concludes that the search warrant issued as to Stephen Edwards' residence was valid.[159]

Additionally, Agent Santini states in his supporting affidavit that he has been a Special Agent for twenty-two years and has been investigating violations involving criminal offenses associated with white collar crime and public corruption for over eighteen years.[160] Agent Santini has extensive experience investigating the types of crime alleged in the present case, and his belief that the items sought would be located at Stephen Edwards' residence is not unreasonable.

Having found that the search of Stephen Edwards' home was supported by probable cause, the Court concludes that seizure of the key to the safe deposit box was valid under the plain view doctrine. Safe deposit box number 5069 was issued to Leslie L. Edwards, with Stephen R. Edwards appointed deputy. Consequently, the subsequent warrant authorizing search of the safe deposit box at Regions Bank was also valid. Indeed, counsel for Stephen Edwards correctly conceded during oral argument that if in fact the initial search of Stephen's home was valid, there would be no grounds to challenge the seizure of the key and the subsequent search of the safe deposit box.[161]

### Search of Edwin Edwards' Residence

Edwin Edwards asserts two bases for invalidating the warrant authorizing the search of his residence: (1) Agent Santini's supporting affidavit contains false statements; and (2) there was no probable cause to search his home because the facts set forth in Agent Santini's affidavit failed to establish the required nexus. The issue of false statements in the affidavit has been extensively addressed by the Court and found to be without merit.

The Court has also extensively addressed the jurisprudence regarding the sufficiency of the nexus between the residence and items sought in the search warrant earlier in this opinion. In the affidavit in support of the warrant to search Edwin Edwards' residence, Agent Santini enumerated numerous consensual recordings, excerpts from Title III interceptions, and physical surveillance activities related to the alleged criminal activities of Edwin Edwards. As previously noted, the totali-

---

**159.** *See also United States v. Robins,* 978 F.2d 881, 892 (5th Cir.1992) (the detective's "experience and common sense" supported the conclusion that "a residence is a quite convenient, commonly-used place for planning continuing criminal activities like large-sale marijuana trafficking and money laundering conspiracies").

**160.** Rec. Doc. No. 448, Exh. 7, Attachment D.

**161.** *See* transcript of oral argument held on November 17, 1999.

ty of the circumstances must be considered in determining whether there was probable cause that the items sought would be found at Edwin Edwards' residence. Incidents should not be considered in isolation irrespective of the surrounding facts.

At the time of the application for the search warrant, FBI agents had been conducting Title III surveillance for approximately four and one-half months.[162] Based upon the Title III interceptions, as well as physical surveillance of Edwin Edwards, Agent Santini referenced conversations and activities which formed probable cause to believe that: (a) Edwin Edwards was engaging in ongoing criminal activity, specifically conspiracies involving bribery and extortion; (b) the activities in furtherance of these alleged crimes occurred both at the office at 4621 Jamestown Avenue and at Edwin Edwards' home; and (c) evidence generated from the alleged criminal activities was being held at Edwin Edwards' home.

Agent Santini's 188–page affidavit in support of the application to search the home of Edwin Edwards enumerates intercepted conversations, consensually recorded conversations, and results of physical surveillance which occurred during the months preceding the application. Agent Santini's affidavit is replete with documentation of calls placed to or from Edwin Edwards' home. On numerous occasions Edwards telephonically "conducted business" on the alleged schemes from his residence.[163] Specifically, Agent Santini asserts in his affidavit that Edwin Edwards conducted business at his home related to the alleged criminal activity which he believed was occurring regarding the Cascade Scheme in December of 1996.

Additionally, the affidavit contains a specific factual link between the fruits or instrumentalities of the alleged criminal activity and the residence of Edwin Edwards. As stated by Agent Santini, FBI agents provided Pat Graham with $100,000.00 of government money. In accordance with the undercover plan of operation, the money was segregated into two bundles—one of $25,000.00 for Cecil Brown, and one of $75,000.00 for Edwin Edwards. Thereafter, Pat Graham, Cecil Brown and Edwin Edwards and his wife had dinner at Ruth's Chris Steak House, during which the Jena Project was discussed.[164] During this discussion, Cecil Brown stated to Edwin Edwards that "I will have your receipt made for the 75 head of cattle tonight." Agent Santini believed this was a reference to the $75,000.00 which was intended for Edwards. As they were leaving the restaurant, Edwards stated to Graham that they had to "go outside and sign those things." Agent Santini believed that this was Edwin Edwards' instruction to retrieve the money from Cecil Brown's car. Graham then gave the $100,000.00 to Cecil Brown. Physical surveillance revealed that Cecil Brown then traveled to Edwin Edwards' home and stayed there for approximately one hour. These statements set forth by Agent Santini in his affidavit provide specific factual support for the likelihood that fruits of the alleged criminal activity would be found at Edwin Edwards' residence.

The affidavit also noted that Edwin Edwards sometimes placed or received telephone calls at his residence, as evidenced by a court-authorized pen register, in furtherance of the alleged conspiracies involving extortion and bribery. At times Edwin Edwards met with persons at his residence, as evidenced by physical surveillance and statements of the confidential witness, again in furtherance of the alleged criminal activity. These factors, in

---

162. The initial Title III interceptions were authorized on December 6, 1996. The search warrant relative to Edwin Edwards' home was issued on April 26, 1997.

163. Application and Affidavit for Search Warrant; Santini affidavit.

164. The Jena Project involved the planning and building of a private juvenile facility in Jena, Louisiana.

conjunction with the assertion that one of the extortion pay-offs was brought to Edwin Edwards' residence, support the finding of probable cause to issue the warrant to search Edwin Edwards' residence. According due deference to the initial determination of probable cause, and applying a "totality of the circumstances" standard, this Court finds that it was not arbitrary for Judge Parker to find that the facts and circumstances described in the affidavit would "warrant a man of reasonable caution to believe that the articles sought" would be located at Edwin Edwards' residence.[165]

Defendants argue that there is no proof that the money allegedly brought to Edwin Edwards' home was still there at the time the search warrant was issued. This argument is unpersuasive. Even if the cash was removed to Edwin Edwards' home, the removal of the cash does not destroy probable cause. The fact that the money was brought to Edwin Edwards' home by Cecil Brown indicates that at times, fruits of the alleged crimes were kept at that location.

Because of the Court's finding that the search of Edwin Edwards' residence was lawful, the argument that the safe deposit box key was illegally seized also fails. Safe deposit box number 2378 was "issued to Sam Robie, with appointed deputies being Edwin W. Edwards and Stephen R. Edwards."[166] Consequently, the key was lawfully seized, and the subsequent warrant to search the safe deposit box at City National Bank was also valid.

**Search of "The Office Located at 4621 Jamestown Avenue"**

Both Edwin Edwards and Stephen Edwards argue that the warrant authorizing the search of the 4621 Jamestown Avenue office is void for lack of particularity in the description of the location in violation of the Fourth Amendment.

The issue before the Court is "not whether the description is technically accurate in every detail, but rather whether the description is sufficient to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premises might be mistakenly searched which is not the one intended to be searched under the warrant."[167]

The initial brief description on the first page of the search warrant is as follows: "The Office Located at 4621 Jamestown Avenue, Baton Rouge, Louisiana."[168] Attachment "A" to the search warrant contains the following description of the location to be searched:

> The law office of EDWIN W. EDWARDS and STEPHEN R. EDWARDS is located at 4621 Jamestown Avenue, Baton Rouge, Louisiana, which is described as a one-story, white brick building. At the main entrance are double glass doors which have the following names listed: The left side glass door is listed LIEUX ENTERPRISES; The right side glass door is listed as EDWIN W. EDWARDS, STEPHEN R. EDWARDS, Attorneys at Law and JOHN M. WAITZ, Attorney at Law. EDWIN W. EDWARDS has his personal office located at the right front corner of the building, that is, the office just past and adjacent to STEPHEN R. EDWARDS' office. Entering the front door of the

---

**165.** *United States v. Freeman,* 685 F.2d 942, 949 (5th Cir.1982).

**166.** Application and Affidavit for Search Warrant for Safe Deposit Box Number 2378, Exhibit 4, Attachment "A".

**167.** *United States v. Prout,* 526 F.2d 380, 387–88 (5th Cir.), *cert. denied,* 429 U.S. 840, 97 S.Ct. 114, 50 L.Ed.2d 109 (1976) (citing *Unit-*

ed States v. Darensbourg, 520 F.2d 985, 987 (5th Cir.1975)). *See also United States v. Melancon,* 462 F.2d 82, 94 (5th Cir.1972), *United States v. Sklaroff,* 323 F.Supp. 296, 321 (S.D.Fla.1971).

**168.** Application for Search Warrant for "The Office Located at 4621 Jamestown Avenue, Baton Rouge, Louisiana."

law office and turning right at the reception desk, the first office on the right as one proceeded down the hall is the personal office of STEPHEN R. EDWARDS. The next office on the right down the hall is the personal office of EDWIN W. EDWARDS. Continuing down the hall and to the left and adjacent to EDWIN W. EDWARDS' office is MARION EDWARDS' office. Further down the hall and the second office on the right is the office of WANDA EDWARDS.[169]

Edwin Edwards, Stephen Edwards, Marion Edwards and Wanda Edwards had previously been designated as interceptees in the Title III authorizations issued by Judge Parker. Although Fred Lieux and John Waitz occupied personal offices in the building at 4621 Jamestown Avenue, there is no indication in the more particularized description set forth in Attachment "A" that their personal offices were to be included in the search. The descriptions in the search warrant sufficiently limited the scope of the search to the personal offices of Edwin Edwards, Stephen Edwards, Marion Edwards and Wanda Edwards. It was reasonable to include within the scope of the search those "common areas" to which all occupants at 4621 Jamestown Avenue had access.

The Court finds that the place to be searched is described with sufficient particularity in the warrant. Based upon the general description and the more specific description in Attachment "A" attached to the search warrant, it is apparent that the agents intended to search the particular offices of Stephen Edwards, Edwin Edwards, Marion Edwards, and Wanda Edwards within the building at 4621 Jamestown Avenue. Given the description of each of the specific offices, it is reasonable to conclude that there was no intent to search the offices of any other persons in the building. This particularized description serves the purpose of preventing "general" searches by limiting the search to the specific areas designated. Further, it was reasonable that the search of those offices would encompass a search of the common areas in the building to which all occupants at 4621 Jamestown Avenue had access, including the kitchen and library/conference room. A diagram of the office at 4621 Jamestown Avenue had previously been submitted to Judge Parker on December 6, 1996 when he authorized Title III interceptions at that location. Judge Parker was clearly familiar with the ongoing investigation and this building because of his prior Title III authorizations. Likewise, Agent Santini was familiar with the layout of the building because of these previous applications and his ongoing involvement in the investigation of Edwin Edwards and Stephen Edwards.[170]

The Court notes that an error in the description of the location is not necessarily fatal to the search warrant.[171] *United States v. Judd* [172] involved the search of two offices in the same building complex, but with two separate doors and two separate addresses. Only one address was listed, but both offices were searched. The Fifth Circuit upheld the search, noting that the defendants' complaint regarding lack of particularity of description was "contrary to well-established law concerning the specificity required in warrants." [173]

---

**169.** Application for Search Warrant for "The Office Located at 4621 Jamestown Avenue, Baton Rouge, Louisiana," Attachment "A".

**170.** *See United States v. Bonner*, 808 F.2d 864 (1st Cir.1986), *cert. denied*, 481 U.S. 1006, 107 S.Ct. 1632, 95 L.Ed.2d 205 (1987) (failure to include address was a minor, technical omission that was not fatal to the warrant; the agents had previously conducted surveillance of the premises, knew precisely which house

was to be searched, and described it accurately and in detail).

**171.** *United States v. Judd*, 889 F.2d 1410 (5th Cir.1989) (citations omitted).

**172.** *Id.*

**173.** *Id.* at 1413.

In the present case, the location of the premises to be searched was sufficiently particularized in the search warrant. The general description, which bears the street address, must be read in conjunction with the more specific description which sets forth the particular personal offices to be searched.

Edwin Edwards and Stephen Edwards also argue that the search warrant is invalid because there was not a sufficient nexus between the items sought in the search warrant and the Jamestown office.[174] As noted earlier in this opinion, Agent Santini submitted a 188–page affidavit in support of the application which included numerous excerpts from consensual recordings, Title III interceptions, and physical surveillance. Many of the activities alleged to have occurred in furtherance of the conspiracies involving extortion and bribery transpired at the Jamestown office. Agent Santini references numerous meetings between Edwin Edwards and/or Stephen Edwards and others, and numerous phone calls in which the alleged schemes were discussed in the offices. There are a number of references to the exchange of money involving Stephen Edwards and Edwin Edwards at the Jamestown office. There are many references to "contracts" and other business records allegedly confected to support the ongoing criminal activities and payment of money. There is also information in the affidavit indicating that cash and business records generated from the activities were stored at the Jamestown office.

Given the extensive information provided by Agent Santini in his supporting affidavit, the Court finds that it was entirely reasonable for Judge Parker to conclude that a sufficient nexus existed between the items sought and the Jamestown location, thereby supporting his determination that probable cause existed to issue the warrant.

**The Search of Cecil Brown's Residence**

Cecil Brown also challenges the search of his home and office and the search of his attorney's office. He asserts the same basic arguments previously disposed of. The Court adopts its previous findings herein and concludes that based on the totality of the information submitted to Judge Walter, there was:

(1) probable cause to issue the warrants;

(2) a sufficient nexus between the criminal activity and the items sought to support the search of Cecil Brown's home and office and the office of his attorney.

**Conclusion**

For reasons set forth herein,[175] the following motions are denied: (1) Motion of Defendant Cecil Brown to Suppress Fruits of Search Warrants (Rec.Doc. No. 450); (2) Motions of Defendants Edwin Edwards, Stephen Edwards, Cecil Brown, Andrew Martin, Bobby Johnson, Gregory Tarver and Ecotry Fuller to Suppress Fruits of Wire, Oral and Electronic Surveillance (Rec.Doc. No. 440); (3) Stephen Edwards' Motion to Suppress Evidence (Rec. Doc. No 445); (4) Defendant Stephen Edwards' Motion to Suppress Fruits of Search Warrants (Rec.Doc. No. 447); (5) Motion to Defendant Edwin Edwards to Suppress Fruits of Search Warrants (Rec. Doc. No. 452); (6) Motion of Defendant Edwin Edwards to Suppress Fruits of Search Warrants (Rec.Doc. No. 469); (7) Motion by Edwin Edwards, Stephen Edwards, Cecil Brown, Andrew Martin, Bobby Johnson, Gregory Tarver and Ecotry Fuller for Reconsideration of Denial of Various Motions to Suppress, Denial of a

---

174. As used herein, the "Jamestown office" refers to the office located at 4621 Jamestown Avenue, including the specific description in Attachment "A".

175. The Court has considered all of the arguments and contentions of the parties whether discussed herein or not.

*Franks* Hearing and for Stay of Introduction of Evidence (Rec.Doc. No. 1004); and (8) Supplemental Motion of Edwin Edwards, Stephen Edwards, Cecil Brown, Andrew Martin, Bobby Johnson, Gregory Tarver and Ecotry Fuller for Reconsideration of Denial of Various Motions to Suppress, Denial of *Franks* Hearing and for Stay of Introduction of Evidence (Rec.Doc. No. 1245).